UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

                                     Case No.: 8:22-cr-259-WFJ/AEP

v.

OMALI YESHITELA,
PENNY HESS,
JESSE NEVEL, and
AUGUSTUS C. ROMAIN, JR.

## UNITED STATES' RESPONSE TO THE DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT

For over seven years, Defendants Omali Yeshitela, Penny Hess, Jesse Nevel, and Augustus C. Romain Jr. worked as witting agents in a Russian government-controlled influence operation conducted on U.S. soil. They allowed the Russian government to hide behind their organization, the African People's Socialist Party, in order to—in their own words—engage "the U.S. and Europe in serious struggle" and "s[o]w division inside the U.S." For these actions, the Defendants are charged with conspiring to act, and acting, as agents of the Russian government, without notification to the Attorney General, in violation of 18 U.S.C. §§ 371 and 951. The Defendants move to dismiss these charges, arguing that the Superseding Indictment targets them solely for their pro-Russian speech, in violation of the First Amendment.

The First Amendment does not protect the Defendants' knowing participation in this Russian government-controlled influence operation. First, Section 951 does not violate the First Amendment because, to the extent that it incidentally affects

speech, it is a content-neutral statute that is narrowly drawn to serve a substantial national security interest. Second, the Superseding Indictment does not violate the First Amendment because it properly charges the Defendants for conspiring to act— and acting—as agents of the Russian government, not because of the content of their speech. Moreover, the Superseding Indictment sets forth sufficient factual allegations to establish the essential facts of the charged offenses. Finally, Section 951 is not unconstitutionally overbroad because it regulates conduct, not speech, and it does not reach a substantial amount of protected speech relative to its plainly legitimate applications. For these reasons, the Defendants' Motion to Dismiss should be denied.

## I.     BACKGROUND

### A.     Procedural History

On April 13, 2023, defendants Yeshitela, Hess, Nevel, and Romain (the "Defendants") were charged by Superseding Indictment with conspiring to act as agents of the Russian government without notification to the Attorney General, in violation of 18 U.S.C. §§ 371 and 951. Yeshitela, Hess, and Nevel were further charged with a substantive violation of Section 951.

On July 17, 2023, Hess filed a Motion to Dismiss the Superseding Indictment (the "Motion") (Dkt. 107).[1] Yeshitela, Nevel, and Romain each moved to adopt the

---

[1] References to docket entries are cited as "Dkt." followed by the number of the entry. The Superseding Indictment is cited as "SI ¶," and overt acts are cited as "OA ¶," followed by the paragraph number of the overt act.

Motion, which the Court granted (Dkt. 114, 123, 127). The Motion argues that the Superseding Indictment should be dismissed because it targets "pure political speech," "peaceable assembly," and "the right to advocate dissenting views," *see* Motion at 8–25, and because Section 951 is facially overbroad, *id.* at 26–28.

### B.    The Superseding Indictment

The Superseding Indictment alleges that the Defendants conspired with Aleksandr Viktorovich Ionov, Yegor Sergeyevich Popov, and Aleksey Borisovich Sukhodolov, and others, to act as agents of the Russian Government without notification to the Attorney General.

According to the Superseding Indictment, Ionov was the founder and president of the Anti-Globalization Movement of Russia ("AGMR"). SI ¶6. Ionov worked on behalf of several Russian Federal Security Service, or "FSB," officers, including Popov and Sukhodolov. *Id.* ¶¶7–10. Popov instructed Ionov that he was "the only person [in the FSB] responsible for working with" Ionov, and that Sukhodolov oversaw "everything" concerning Ionov's work for the FSB. *Id.* ¶8.

Defendants Yeshitela, Hess, Nevel, and Romain were leaders in the APSP, which was headquartered in St. Petersburg, Florida. *Id.* ¶¶11–16. In 2018, Romain left the APSP and founded the Atlanta-based group "Black Hammer." *Id.* ¶16.

In 2015, the Defendants began to act subject to Ionov's direction and control within the United States, knowing that Ionov was being directed by the Russian government. In a September 23, 2015 email, Nevel summarized Yeshitela's remarks after attending a Russian government-funded conference hosted by Ionov in

Moscow. OA ¶17. In these remarks, Yeshitela acknowledged that Ionov's organization was an "instrument of Russian government." *Id.* In another email sent one week later, APSP leadership – including Yeshitela, Hess, Nevel, and Romain – recognized that the Russian government was "more than likely" using Ionov's organization to engage "the U.S. and Europe in serious struggle" and to "utilize forces inside of the U.S. to s[o]w division inside the U.S." OA ¶18. These communications—sent by and amongst the Defendants themselves—confirm that they knew, as early as September 2015, that Ionov and his organization were instruments of the Russian government.

The Superseding Indictment alleges that the Defendants and their co-conspirators employed several means to achieve their conspiratorial goals. For example, Ionov communicated with his FSB handlers "for the purpose of developing and executing a plan to recruit, fund, and direct" the APSP and other U.S. groups for, among other purposes, "funding and consulting with campaigns for elected office within the United States." SI ¶26(b). The Defendants published articles authored by Ionov, published articles at his direction, welcomed him to speak "on behalf of the Russian Federation" in online presentations, and made "public statements in support of the Russian Federation and its interests when directed to by Ionov." *Id.* ¶23(d). Ionov exercised direction and control over some of the Defendants' protests, political campaigns, and other actions within the United States, and promoted their activities in Russian state-supported media. *Id.* ¶¶23(e)–(f). The

Defendants provided detailed information concerning their activities to Ionov, which he reported to the FSB. *Id.* ¶23(g).

Ionov also directed the Defendants to write or publish articles that contained "Russian propaganda and disinformation." *Id.* ¶26(c). In this context, the term "disinformation" does not refer to information that is necessarily false. Rather, it refers to Russian intelligence's longstanding employment of "active measures,"[2] which are "influence operations" utilized by the Russian government to, "among other things, seek[] to create wedges that reduce trust and confidence in democratic processes, degrade democratization efforts, weaken U.S. partnerships with European allies, undermine Western sanctions, encourage anti-U.S. and anti-Western political views, and counter efforts to bring Ukraine and other former Soviet states into European and international institutions." *Id.* ¶21.

---

[2] In his book "Active Measures," historian Thomas Rid summarizes the relationship between "disinformation" and "active measures" as follows:

> First, and most important, active measures are not spontaneous lies by politicians, but the methodical output of large bureaucracies. Disinformation was, and in many ways continues to be, the domain of intelligence agencies – professionally run, continually improved, and usually employed against foreign adversaries. Second, all active measures contain an element of disinformation: content may be forged, sourcing doctored, the method of acquisition covert; influence agents and cutouts may pretend to be something they are not, and online accounts involved in the surfacing or amplification of an operation may be inauthentic. Third, an active measure is always directed toward an end, usually to weaken the targeted adversary. The means may vary: creating divisions between allied nations, driving wedges between ethnic groups, creating friction between individuals in a group or party, undermining the trust specific groups in a society have in its institutions. . . .

> [D]isinformation is not simply fake information – at least, not necessarily. Some of the most vicious and effective active measures in the history of covert action were designed to deliver entirely accurate information.

THOMAS RID, ACTIVE MEASURES 9–10 (2020).

The overt acts in the Superseding Indictment delineate some of the actions that the Defendants and their co-conspirators took in furtherance of this conspiracy. For example, in July of 2015, Ionov directed Hess to draft a "petition on Genocide of African people in U.S.," which AGMR would promote in the media. OA ¶5. When Hess suggested that Ionov should promote and publish the petition himself, Ionov reiterated his directive that Hess and the APSP needed to publish the petition because Ionov and AGMR were "not exactly Black to demand [reparations] for [them]selves." OA ¶7. Ionov continued to send money to the APSP and pressure Hess and Nevel to publish the petition, which they ultimately did. OA ¶¶8–14.

In early 2016, Ionov directed defendant Hess and other APSP members to carry out a series of protests across the United States, in order to promote the genocide petition. OA ¶19 (letter from Hess thanking Ionov for his "leadership in envisioning" the tour). Ionov promised to pay $12,000 for the protests and directed Hess to submit a report concerning the protests' impact. OA ¶¶20–22. Before submitting the report to Ionov, Yeshitela mused whether "the Russians [would] get from us what they need" to justify funding the protests. OA ¶¶23–25.

In July of 2016, Ionov requested that the APSP publish an article in support of the Russian Olympic team. OA ¶27. The Defendants jumped to action, with Hess circulating a draft statement that same day. OA ¶28. Yeshitela approved the statement, and Hess published it in the name of the APSP. OA ¶¶29–30.

In 2017, Nevel ran for local political office in St. Petersburg. SI ¶14. Ionov offered to assist the campaign, including through "campaign finance." OA ¶31.

In 2019, the APSP's Director of Agitation and Propaganda, Unindicted Co-Conspirator 4 ("UIC-4"), ran for local political office in St. Petersburg. SI ¶15. Ionov reported on this campaign to the FSB, telling them that he had donated $450 to the campaign and participated in other fundraising events, and he provided statistics to them concerning the campaign's successes. OA ¶¶45–52. The FSB handlers told him that it would be "good" if UIC-4 won the campaign, which they referred to as "[o]ur election campaign." OA ¶¶46, 51. Ionov similarly referred to UIC-4 as the candidate "whom we supervise." OA ¶52. Ionov later reported to the FSB that the experience in UIC-4's and Nevel's campaigns would allow for "more effective campaigns during municipal elections" in the future. OA ¶62.

Throughout 2020 and 2021, the Defendants provided information concerning their activities in the United States to Ionov, which Ionov in turn reported to the FSB. For example, in June of 2020, Ionov reported to Popov that he had helped the APSP to prepare "activists" who, at the time, were "taking to the street and leading the way" in ongoing demonstrations. OA ¶60. Shortly after the November 2020 U.S. election—which Popov had instructed Ionov was the FSB's "main topic of the year," SI ¶3—Ionov reported to Popov that he had contributed $1200 toward a protest that Yeshitela had led in Washington, D.C. OA ¶62. In July of 2021, Ionov reported to Popov that he had spoken with Hess, who had asked whether members of the APSP could again travel to Russia because, absent Ionov's help, the APSP "had difficulty getting coverage from the international press." OA ¶65.

On February 24, 2022, Russian President Vladmir Putin announced that Russia had invaded Ukraine. That same day, Ionov sent an email to Nevel, which Nevel forwarded to Yeshitela and Hess, outlining the Russian government's state-sponsored messaging concerning the invasion. OA ¶66. Yeshitela, UIC-4, and other APSP members again leapt into action, hosting a series of video conferences in which they parroted Ionov's government-approved message and welcomed Ionov as a guest speaker. OA ¶¶67–71. Ionov later reported to his FSB handlers that the Defendants had hosted these video conferences because he had appealed to them to support Russia in the "information war unleashed" by the West. OA ¶72. Thereafter, former APSP leader Romain led a series of protests at Ionov's direction, targeting U.S. companies who had angered the Russian government. OA ¶¶76–94.

On July 29, 2022, the U.S. Department of Justice issued a press release that discussed an Indictment charging Ionov with the above-described conspiracy. OA ¶95. That same day, Ionov sent Popov a Russian translation of the press release and directed him to "trash the phones." *Id*

## II.   LEGAL STANDARD

### A. Motion to Dismiss

Federal Rule of Criminal Procedure 7(c)(1) provides: "The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." An indictment is sufficient if it includes "all elements of the offense and briefly describe[s] the facts of the commission of offense." *United States v. deVegter*, 198 F.3d 1324, 1330 (11th Cir. 1999).

A motion to dismiss an indictment may only be decided prior to trial if the court can rule on the motion "without a trial on the merits." Fed. R. Crim. P. 12(b)(1). This requirement is met only if a "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the [motion]." *United States v. Covington*, 395 U.S. 57, 60 (1969). Therefore, in analyzing a motion to dismiss, the court is limited to the allegations in the indictment and must read those allegations in the light most favorable to the government. *See United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).

## B. First Amendment

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . or the right of the people peaceably to assemble." U.S. Const. amend. I. Under this Clause, Congress may not "restrict expression because of its message, its idea, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (internal marks omitted). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Content-based regulations of speech are subject to "strict scrutiny," meaning that they are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* Under strict scrutiny, a law is narrowly tailored only if it constitutes "the least restrictive means of advancing a compelling government interest." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005).

In contrast, laws that do not regulate speech based on its content—like the statute challenged in the instant motion to dismiss—are subject to "intermediate scrutiny." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291 (11th Cir. 2021). Content-neutral laws may regulate "expressive conduct," meaning that they incidentally burden expression through a regulation of conduct, or they may regulate the "time, place, and manner" of expression. *Id.* at 1291–92. Importantly, as the Eleventh Circuit has held, the standards for evaluating these two categories of content-neutral laws "substantially overlap." *Id.* And, "as a practical matter, there is little difference between them." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1244 (11th Cir. 2022).

To be permissible under the First Amendment, a content-neutral regulation of expressive conduct must be "narrowly drawn to further a substantial governmental interest unrelated to the suppression of free speech." *Fort Lauderdale*, 11 F.4th at 1291 (alteration adopted); *see also United States v. O'Brien*, 391 U.S. 367, 376 (1968) (explaining that, when "speech and nonspeech elements are combined in the same course of conduct . . . a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms"); *Clark v. Comm. For Creative Non-Violence*, 468 U.S. 288, 294 (1984) (same).

Similarly, a content-neutral time, place, and manner restriction on expression survives First Amendment scrutiny if it is "narrowly tailored to serve a significant government interest" and "leave[s] open ample alternative channels for

communication of information." *Fort Lauderdale* , 11 F.4th at 1292; *see also Clark*, 468 U.S. at 293 (same).

To satisfy the "narrowly drawn" requirement, a content-neutral law "need not be the least restrictive or least inclusive means of serving the government's interests." *Id.* at 1295. Rather, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* (internal marks omitted).

## III.   ANALYSIS

### A.   Section 951 is constitutional as applied to the Defendants' conduct alleged in the Superseding Indictment.

#### 1. Section 951 is a content-neutral regulation that withstands intermediate scrutiny.

Section 951 makes it a crime for an individual other than an officially recognized diplomatic or consular officer to "act[] in the United States as an agent of a foreign government without prior notification to the Attorney General." 18 U.S.C. § 951(a). The statute defines an "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d). The relationship between the foreign government and its agent "does not need to mirror an employee's control over the workings of an employee; a lesser degree of 'direction' is sufficient." *United States v. Rafiekian*, 991 F.3d 529, 541 (4th Cir. 2021). Indeed, "an independent contractor may also be an agent—while still retaining significant discretion over the

particulars of performance—so long as he 'contracts to act on account of the [foreign government].'" *Id.* at 540 (quoting Restatement (Second) of Agency §§ 2 cmt. b, 14N, 220 cmt. e (Am. L. Inst. 1958)).

To begin with, Section 951 "plainly does not abridge free speech on its face." *O'Brien*, 391 U.S. at 375. The statute nowhere mentions speech or other First Amendment-protected conduct. Rather, the law's focus is on the "defendant's *action* and *conduct* as an agent of a foreign government." *United States v. Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010). Section 951 does not restrict any acts or speech; it simply requires that agents of a foreign government notify the Attorney General before acting in the United States.

To the extent that Section 951's notification requirement incidentally burdens expression, it is content neutral. If viewed as a regulation of expressive conduct, Section 951 is content neutral because it applies to a "host of [activities]" that "usually do not involve expressive conduct," and it "does not draw distinctions based on any message" that the agent of a foreign government wishes to convey. *Fort Lauderdale*, 11 F.4th at 1292. As the Eleventh Circuit has observed, Section 951 serves as a "catch-all statute that . . . cover[s] all conduct taken on behalf of a foreign government." *Duran*, 11 F.3d 1295.

Similarly, if viewed as a time, place, and manner restriction, Section 951 is content neutral because it is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791–92 (1989). Indeed, Section 951 contains no reference to speech, much less to its content. To the extent

that Section 951 places any regulations on speech, it regulates only the place (in the United States) and manner (only after notification to the Attorney General) of any speech. For these reasons, "[t]o the extent Section 951 proscribes speech at all, it is content-neutral" and must be evaluated under intermediate scrutiny. *United States v. Alshahhi*, 2022 WL 2239624, at *6 n.6 (E.D.N.Y. June 22, 2022).

Section 951 satisfies intermediate scrutiny because it "is narrowly drawn to further a substantial governmental interest" that is "unrelated to the suppression of free speech." *Fort Lauderdale,* 11 F.4th at 1291. First, Section 951 furthers legitimate and important Government interests that have nothing to do with free expression. The Eleventh Circuit has recognized that "Section 951 sweeps broadly because the Government has an interest in knowing the identity of those acting on behalf of a foreign government within the United States, whether the action is legal or not." *Duran*, 596 F.3d at 1295; *see also Rafiekian*, 991 F.3d at 538 (recognizing that Section 951 serves the United States' "strong interest in identifying people acting at the behest of foreign governments within its borders"). This interest is plainly unrelated to the suppression of speech or expressive conduct because the law applies with equal force regardless of whether the agent engages in speech or some other form of action, and because the law does not suppress speech at all, it only requires notification to the Attorney General. According to its legislative history, Section 951's predecessor statute arose out of post-World War I concerns relating to "national security, defense and targeting espionage and subversive acts," but Section 951 was subsequently enacted to encompass "*any* affirmative conduct undertaken as an agent of a foreign

government." *Duran*, 596 F.3d at 1294–95. Plainly, the key national security interests

furthered by Section 951 are unrelated to free expression.

Second, the interests furthered by Section 951 are substantial. As the Supreme

Court has recognized in the context of a statute requiring organizations controlled by

the "world Communist movement" to register with the Attorney General, these

types of national security interests lie at the heart of American sovereignty:

> Means for effective resistance against foreign incursion – whether in the
> form of organizations which function, in some technical sense, as
> "agents" of a foreign power, or in the form of organizations which, by
> complete dedication and obedience to foreign directives, make
> themselves the instruments of a foreign power-may not be denied to the
> national legislature. To preserve its independence, and give security
> against foreign aggression and encroachment, is the highest duty of
> every nation, and to attain these ends nearly all other considerations are
> to be subordinated. It matters not in what form such aggression and
> encroachment come.

*Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 88–90 (1961)

(internal marks omitted). Thus, the core focus of Section 951 – requiring disclosure

by agents of foreign governments – serves "the highest duty" of the United States

Government. *Id.*

Third, Section 951 is narrowly drawn because its notification requirement is

"not substantially broader than necessary to achieve the government's interest." *Fort

Lauderdale* , 11 F.4th at 1295. To be sure, Section 951 "sweeps broadly" in terms of

the conduct that it governs, but that broad sweep is necessary to serve the United

States' "interest in knowing the identity of those acting on behalf of a foreign

government within the United States." *Duran*, 596 F.3d at 1295. Critically, however,

Section 951 does not forbid any action at the direction of a foreign government, whether speech or otherwise. Rather, Section 951 merely requires that, if an individual wishes to act on behalf of a foreign government within the United States, he or she must notify the Attorney General prior to undertaking the action.

The Supreme Court has previously upheld similar notification requirements against First Amendment challenge. For example, in rejecting a First Amendment challenge to an onerous registration requirement for organizations controlled by the "world Communist movement," the Court explained:

> Where the mask of anonymity . . . serves the double purpose of protecting [a group] from popular prejudice and of enabling them to cover over a foreign-directed conspiracy, infiltrate into other groups, and enlist the support of persons who would not, if the truth were revealed, lend their support, it would be a distortion of the First Amendment to hold that it prohibits Congress from removing the mask.

*Communist Party of U.S.*, 367 U.S. at 102–03; *see also United States v. Harriss*, 347 U.S. 612, 625-26 (1954) (rejecting First Amendment challenge to criminal conviction under statute requiring congressional lobbyists to register because the statute "merely provided for a modicum of information from" professional lobbyists in order to "maintain the integrity of a basic governmental process"). It is well within Congress's power to "remov[e] the mask" from foreign government-controlled agents by requiring them to notify the Attorney General prior to acting in the United States, which is precisely what Section 951 does.

Section 951 also leaves open "ample alternative channels for communication of information" as required for "time, place, and manner" restrictions. *Fort*

*Lauderdale* , 11 F.4th at 1292. Indeed, Section 951 leaves available all communication channels, so long as notification is provided to the Attorney General. *See Alshahhi*, 2022 WL 2239624, at *6n.6 ("The important national security interests [furthered by Section 951], combined with reasonable time, place, and manner restrictions, easily survive intermediate scrutiny."). And it has no application to persons speaking on their own, regardless of message. It only applies to action taken in the United States on behalf of a foreign government.

The Defendants rely heavily on *De Jonge v. State of Oregon*, 299 U.S. 353 (1937), but that case has no bearing here. In *De Jonge*, the defendant was convicted of violating a criminal syndicalism statute solely for "assist[ing] in the conduct of a public meeting, albeit otherwise lawful, which was held under the auspices of the Communist Party." *Id.* at 362. The statute at issue directly criminalized speech based on its content, making it unlawful to advocate for the use of unlawful acts to effect political change, or to organize any group that so advocates. *Id.* at 356 n.1.[3] The statute thereby effectively outlawed any meetings of the Communist Party for any purposes. *Id.* at 362–63. The Supreme Court observed that it was well within the States' power to "protect themselves from the abuse of privileges of our institutions through an attempted substitution of force and violence in the place of peaceful

---

[3] The statute provided, in part: "Any person who, by word of mouth or writing, advocates or teaches the doctrine of criminal syndicalism," or who "organize[s] . . . any society or assemblage or persons which teaches or advocates the doctrine of criminal syndicalism . . . shall be punished by imprisonment . . . for a term of not less than one year or more than 10 years . . . ." *De Jonge*, 299 U.S. at 356 n.1.

political action," but determined that the complete prohibition in the Oregon statute went too far. *Id.* at 363. Because the statute made "peaceable assembly for lawful discussion" a crime, the Court held that it violated the First Amendment. *Id.* at 365.

Section 951 is entirely distinguishable from the law at issue in *De Jonge* because it does not regulate speech based on its content, nor does it forbid any speech, assembly, publications, or other First Amendment-protected conduct. Section 951 merely requires that individuals or groups who intend to act as agents of a foreign government first notify the Attorney General. This notification requirement's "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance," *O'Brien*, 391 U.S. at 377, of the United States' well-founded interest in "knowing the identity of those acting on behalf of a foreign government within the United States," *Duran*, 596 F.3d at 1295.

The Defendants point to *Thomas v. Collins*, 323 U.S. 516, 530 (1945), to argue that "[a]ny attempt to restrict political speech . . . 'must be justified . . . by clear and present danger.'" Motion at 12. Like *De Jonge*, *Thomas* involved a content-based regulation of speech. *See Thomas*, 323 U.S. at 518 (striking down court order requiring labor organizer to register before "soliciting members for or memberships in specified labor unions").[4] Moreover, the standard articulated in *Thomas* and

---

[4] The other principal cases the Defendants rely upon similarly involved laws that directly regulated speech based on its content. *See NAACP v. Button*, 371 U.S. 415, 433 (1963) (striking down Virginia law that "proscrib[ed] any arrangement by which prospective litigants are advised to seek the assistance of particular attorneys"); *West Virginia State Board of Educ. v. Barnette*, 319 U.S. 624, 630 (1943) (striking down state law compelling students to salute American flag and say pledge of allegiance).

refined in later cases such as *Brandenburg v. Ohio*, 395 U.S. 444 (1969), did not

categorically bar all restrictions on speech. Rather, this line of cases created an

exception to the First Amendment where speech poses a "clear and present danger."

*See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791 (2011) (listing *Brandenburg's*

incitement carve out as one of several exceptions to the First Amendment). This

standard is separate and distinct from the incidental regulation of "expressive

conduct" permitted by *O'Brien* and on the "time, place, and manner" regulation of

speech permitted by *Clark*. Indeed, the very passage of *Thomas* quoted by the

Defendants explicitly recognized that laws may regulate the "appropriate time and

place" of "orderly discussion." Motion at 12 (quoting *Thomas*, 393 U.S. at 530). As

detailed above, content-neutral regulations that only incidentally restrict speech are

constitutionally permissible so long as they are narrowly drawn to support an

important government interest unrelated to the speech itself. *See Fort Lauderdale*, 11

F.4th at 1291-92 (citing *O'Brien* and *Clark*). Thus, the government does not need to

establish that Defendants' speech presented a "clear and present danger" in order for

Section 951 to survive the instant challenge.

Finally, even if Section 951 proscribed content-specific speech—which it

unequivocally does not—it nevertheless satisfies the strict scrutiny standard because

it is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. As

explained above, the statute protects this Country's compelling national security

interests, and it is narrowly tailored to support those compelling interests. The only

burden that Section 951 imposes is the requirement of prior notification to the

Attorney General, which the statute narrows to a relatively discrete group: individuals acting in the United States subject to the direction or control of a foreign government. The statute is then further narrowed by the statutory exceptions to the term "agent." *See* 18 U.S.C. § 951(d).[5] This narrowing of the scope of people covered by Section 951 to include only clearly defined foreign government agents ensures that it is the "least restrictive means," *Solantic, LLC*, 410 F.3d at 258, of advancing the Government's compelling "interest in knowing the identity of those acting on behalf of a foreign government within the United States," *Duran*, 596 F.3d at 1295.

For these reasons, Section 951's requirement that foreign government agents notify the Attorney General before acting in the United States does not violate the First Amendment. To conclude otherwise "would make a travesty of that Amendment and the great ends for the well-being of our democracy that it serves." *Communist Party of U.S.*, 367 U.S. at 89.

---

[5] The Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) is instructive. In that case, the Supreme Court considered the First Amendment implications of 18 U.S.C. § 2339B, the statute prohibiting material support to foreign terrorist organizations ("FTO") as applied to a human rights organization and individuals who wanted to provide support for "humanitarian and political activities" of the FTO. 561 U.S. at 10. The Court held that Section 2339B does not violate the First Amendment, even where the material support alleged is "support…in the form of speech." *Id.* at 28. The Court found that Section 2339B was a content-based restriction because—unlike Section 951—whether a person was prohibited from speaking "depends on what they say." *Id.* at 27. Despite subjecting the statute to strict scrutiny on this basis, the Court concluded that "national security and foreign policy concerns" constituted valid and compelling government interests, and the statute was narrowly tailored to promote those interests. *See id.* at 34-39. If a statute can entirely and explicitly prohibit forms of speech to promote a national security interest, then a statute that merely requires notification to promote national security interests likewise must survive judicial scrutiny.

2.  **The allegations in the Superseding Indictment are sufficient and Defendants' as-applied challenge fails.**

The Superseding Indictment adequately pleads each of the elements of a criminal violation of Section 951. That is all that is required, as an indictment need only be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7. Moreover, a review of the Superseding Indictment makes clear that the government has a substantial enforcement interest in this case and that this interest is unrelated to the suppression of speech. Because this satisfies the *O'Brien* standard, the Superseding Indictment does not run afoul of the First Amendment.

As an initial matter, "[a]n indictment need do little more than track the language of the statute charged to be sufficient." *United States v. Adkinson*, 135 F.3d 1363, 1375 n.37 (11th Cir. 1998). Here, the Superseding Indictment adequately alleges that Defendants conspired to violate and violated Section 951. Specifically, Count 1 alleges that each of the Defendants "knowingly and willfully" conspired "to act as an agent of a foreign government and foreign officials, to wit, the Russian Federation and officials of that government, without prior notification to the Attorney General, as required by law." *See* SI at 9. Count 2 similarly alleges each of the elements of a substantive Section 951 violation. *See* SI at 35–36. Thus, accepting these allegations as true, the Superseding Indictment adequately alleges that the Defendants conspired to violate, and violated, Section 951.

Rather than challenge the sufficiency of the Superseding Indictment, the Defendants argue that "[t]his case is about pure political speech." Motion at 10. For support, the Defendants point to certain allegations which, they claim, concern their speech and expressive conduct. *Id.* at 8. Thus, the Defendants contend, the Superseding Indictment is unconstitutional as applied to their alleged conduct. The Defendants' argument is flawed for several reasons and should be rejected.

The correct framework for analyzing the Defendant's purported as-applied challenge was set forth in *Texas v. Johnson*, 491 U.S. 397 (1983), where the Supreme Court considered the constitutionality of a Texas statute that criminalized burning the American flag. As here, the challenge in *Johnson* was an as-applied challenge. *Id.* at 402. In its decision, the Court explained that where, as here, the government's asserted interest is "unrelated to the suppression of free expression," then the "less stringent standard . . . for regulations of noncommunicative conduct controls." *Id.* at 403 (citing *O'Brien*, 391 U.S. at 377). As detailed above, the *O'Brien* standard requires only that the government act with "a substantial governmental interest unrelated to the suppression of free speech." *Fort Lauderdale*, 11 F.4th at 1291.

Here, the Superseding Indictment contains sufficient factual allegations to establish that the Government interest in this prosecution is (1) "unrelated to the suppression of free speech," and (2) "substantial." *Id.* Therefore, the Defendants' as-applied challenge fails.

The crux of the Superseding Indictment is the allegation that the Defendants "act[ed] as an agent of a foreign government and foreign officials . . . without prior

notification to the Attorney General." SI at ¶9, 36. The allegations further place the Defendant's conduct into the necessary historical context of the Russian government's goals to "expand Russia's sphere of influence" through "influence operations." *Id.* ¶21. These influence operations "recruit U.S. persons to advance Russia's operational goals," including through "amplify[ing] and reinforc[ing] Russia's messaging campaigns in furtherance of its goal of destabilizing Western societies," and "propagat[ing] disinformation," among other means. *Id.* ¶¶22–23. Thus, the interests justifying the prosecution of the Defendants under Section 951 have no relation to their exercise of free expression. Rather, these interests relate only to the Defendants' agreement to act at the direction and control of the Russian government as part of a Russian government-controlled influence operation. Moreover, such interests serve "the highest duty" of the United States Government, *Communist Party of U.S.*, 367 U.S. at 88-90, and are therefore "substantial," *O'Brien*, 391 U.S. at 377.

### 3. The Defendants' remaining arguments misunderstand the allegations in the Superseding Indictment and the law.

In their attempt to paint the Superseding Indictment as targeting their free expression, the Defendants ignore the well-established principle that the First Amendment does not prohibit "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell,* 508 U.S. 476, 489 (1993); *see also Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a

course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."). Indeed, the Supreme Court has repeatedly recognized that "words can in some circumstances violate laws directed not against speech but against conduct." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) (collecting cases). The mere fact that a significant manner by which the Defendants acted subject to the direction and control of the Russian government was through publishing articles, making speeches, and related conduct does not render the Superseding Indictment constitutionally infirm.

The Defendants also misunderstand the overt act requirement in conspiracy law, equating each of the alleged overt acts to separate "charged offenses" and misguidedly subjecting each overt act to a stand-alone strict scrutiny analysis. *See* Motion at 10-11. An overt act is any act that "furthers the purpose of the conspiracy." *United States v. Campa*, 529 F.3d 980, 1002 (11th Cir. 2008). An overt act need not "be the substantive crime charged in the indictment as the object of the conspiracy," nor must an overt act "taken by itself, even be criminal in nature." *United States v. Yates*, 354 U.S. 298, 334 (1957). Rather, "[t]he function of the overt act in a conspiracy prosecution is simply to manifest that the conspiracy is at work." *Id.* Accordingly, the Defendants are not being charged with separate crimes for simply "speaking at conferences, peaceable rallies and at multi-city speaking tours," "publishing articles," or "criticiz[ing] NATO expansion eastward to Russia's border." Motion at 10. The Defendants are instead charged with conspiring to act,

and acting, at the direction of the Russian government, and each of the overt acts helps to reveal the conspiracy at work over its seven-year span.

A review of the alleged overt acts reveals that the Defendants and their co-conspirators have not been singled out for pro-Russian speech, but rather for acting under the direction and control of the Russian government. The overt acts discuss a wide variety of seemingly disparate newspaper articles, speeches, and other conduct by the Defendants and their co-conspirators, including: publishing a petition alleging genocide against African peoples by the United States at Ionov's direction, *see* OA ¶¶5–14; engaging in a series of protests that was "envision[ed]" and funded by Ionov to promote the genocide petition, *see* OA ¶¶19–26; publishing an article in support of the Russian Olympic team at Ionov's direction, *see* OA ¶¶27–30; conducting a demonstration to promote California secession, in order to cause "turmoil" at the behest of Russian intelligence, *see* OA ¶¶32–39; conspiring to help lobby to free Russian detainees, OA ¶43; facilitating Russian oversight of candidates in U.S. elections, OA ¶¶31, 44–53; promoting the independence of Russian-backed Ukrainian breakaway states under Ionov's direction and control, OA ¶¶54–59; passing information to Ionov to report to his FSB handlers, OA ¶¶60–65; parroting Russian government propaganda concerning the invasion of Ukraine after being enlisted by Ionov to serve in the Russian government's "information war" against the United States, OA ¶¶66–75; and protesting against U.S. social media and news companies at Ionov's direction, in order to punish the companies for views and actions that displeased the Russian government, OA ¶¶83–94. The common theme in

these overt acts is the hidden hand of the Russian government, pulling the strings in order to – in the Defendants' own words – "utilize forces inside of the U.S. to s[o]w division inside the U.S." OA ¶18.

Additionally, the Defendants' argument also misunderstands certain key factual allegations in the Superseding Indictment. The Defendants contend that they are charged with crimes because they engaged in speech that the Government believes is "false" or "wrong." Motion at 18–22. This assertion is based on a misunderstanding of the terms "propaganda and disinformation" in the Superseding Indictment. As explained above, *see supra* at 5, these terms do not refer to the truth or falsity of any of the Defendants' or their co-conspirators' statements. Rather, they refer to the Defendants' actions under the direction and control of the Russian government as part of an influence operation intended to target the United States and its western allies. *See* SI ¶¶21–23.

Finally, the Defendants improperly invite the Court to invade the province of the jury, arguing that their conduct is protected by the First Amendment because they acted solely based on their long-held personal views and that, at most, the allegations in the Superseding Indictment show that they were "somehow influenced by Russia in their criticism of U.S. policy." *See* Motion at 13–17. At trial, the jury will determine whether, based on the evidence outlined in the Superseding Indictment as well as substantial other evidence, the Defendants agreed to act subject to the direction or control of the Russian government or officers thereof without notification to the Attorney General. If the jury finds that they did, then they will be

found guilty. If the jury finds that they acted independently and not as agents of the Russian government, then some of the acts discussed in the Superseding Indictment may be protected by the First Amendment – but, more importantly for present purposes, they will not be guilty of the charged crimes.

The Seventh Circuit's decision in *United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005), supports this conclusion that Section 951's criminalization of only agreements to act *at the direction or control of a foreign government* adequately ensures that a defendant cannot be convicted of violating Section 951 based solely on protected speech. In *Dumeisi*, a newspaper owner was charged with conspiring to act as an agent of the Iraqi government without notification to the Attorney General for, among other things, "publishing certain news articles that would enable him to identify opposition members" at the direction of the Iraqi government. *Id.* at 570-71, 579. At trial, the defendant requested that the court instruct the jury that "[i]t is not a violation of 18 U.S.C. § 951(a) to publish a news article." *Id.* at 579. The district court rejected that instruction, instead instructing the jury that:

> The First Amendment to the Constitution protects the right to free speech and the freedom of the press. This means that individuals are permitted to express views that are controversial or even despicable. The speech that Mr. Dumeisi gave at the Iraqi Mission and newspaper articles he authored or published are protected by the First Amendment. The speech and newspaper articles, as well as Mr. Dumeisi's opinion and political views, are to be considered only insofar as they may pertain to issues of motive and intent.

*Id.* Dumeisi was convicted and appealed, arguing that the court's refusal to give his requested instruction created the "very real probability that the jury's verdict rested on the sole basis that Dumeisi printed articles in his newspaper." *Id.*

The Seventh Circuit rejected Dumeisi's First Amendment challenge, holding that his requested instruction that publishing articles cannot violate Section 951 was "misleading as to the law" because "an element of § 951 is acting 'subject to the direction or control of a foreign government or official,' 18 U.S.C. § 951(d), and there was evidence suggesting that Dumeisi published certain articles at the behest of the [Iraqi government]." *Id.* The court observed that the district court's instruction made clear that "Dumeisi should not, and legally could not, be convicted simply for publishing unpopular or even despicable opinions." *Id.* Moreover, the court explained, the district court's instruction ensured that the defendant's First Amendment-protected speech was not "the sole basis for a guilty verdict." *Id.*[6]

Here, as in *Dumeisi*, the Defendants would not be convicted "simply for publishing unpopular or even despicable opinions." *Id.* They will only be convicted if

---

[6] The Defendants misread *Dumeisi* as holding that publishing articles at the direction of a foreign government cannot form the basis of a Section 951 conviction. *See* Motion at 24–25. In rejecting Dumeisi's argument that the evidence "established nothing more than that he gathered publicly accessible information, published news articles, and communicated with foreign consular officials" the Seventh Circuit pointed to "ample evidence that Dumeisi acted knowingly at the behest of" Iraqi intelligence, including "evidence that Dumeisi initiated contact with the [Iraqi government] and offered to publish articles supplied by them" and that he "printed provocative articles in his paper in order to learn more about" Iraqi dissidents. *Dumeisi*, 424 F.3d at 581. Thus, the Court clearly determined that publishing articles at the direction of Iraqi intelligence was a legitimate basis for Dumeisi's conviction.

the jury determines, beyond any reasonable doubt, that they acted subject to the direction or control of the Russian government.

Moreover, even if the Court were to conclude that the governmental interests justifying the charges in the Superseding Indictment relate to the Defendants' free expression—and as explained above, it should not—the Superseding Indictment would nevertheless be proper because the governmental interests at stake "are so substantial as to justify infringement on constitutional rights." *Monroe*, 793 F.2d at 573. "It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981). The Defendants' actions alleged in the Superseding Indictment strike at the heart of American national security interests, facilitating the efforts of a hostile foreign intelligence service to manipulate debates, elections, and policy in this Country. This conclusion will be ever more apparent after the Court hears the substantial additional evidence that will be presented at trial.

In light of these compelling governmental interests, it "would be a distortion of the First Amendment" to prevent the Government from enforcing Section 951 to "remov[e] the mask" that concealed this years-long "foreign-directed conspiracy." *Communist Party of U.S.*, 367 U.S. at 102–03. For all of these reasons, the Defendants' Motion should be denied.

## B.   Section 951 is not unconstitutionally overbroad.

"According to [the Supreme Court's] First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech."

*United States v. Williams*, 553 U.S. 285, 292 (2008). Even where a statute may sweep in some protected speech, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (internal marks omitted). Therefore, the Supreme Court has "insisted that a law's application to protected speech be substantial, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." *Id.* at 119-20 (internal quotation marks and citation omitted). Moreover, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Id.* at 124.[7]

Section 951 is not substantially overbroad. First, as the Eleventh Circuit has recognized, 951 regulates conduct—acting at the direction or control of a foreign government—not speech. *See Duran*, 596 F.3d at 1292 ("[W]hether a defendant must [provide notice] under § 951 depend on the defendant's *action* and *conduct* as an agent of a foreign government."). A person may be convicted under Section 951 for entirely non-speech conduct, as has occurred in prior cases involving conduct such as passing technologically sensitive information to foreign governments or operating as

---

[7] The primary case relied on by the Defendants in support of their overbreadth argument involved picketing, an inherently expressive activity. *Thornhill v. State of Alabama*, 310 U.S. 88, 101 (1940) (striking down state law that criminalized "every practicable method whereby the facts of a labor dispute may be publicized in the vicinity of the place of business of an employer").

a "sleeper agent" in the United States with no specific tasking. *See United States v. Chung*, 659 F.3d 815, 818–23 (9th Cir. 2011) (involving a Section 951 violation by a Boeing engineer who shared sensitive technological information with China); *United States v. Latchin*, 554 F.3d 709, 710–11 (7th Cir. 2009) (involving an Iraqi "sleeper agent"). Even where a person's speech might constitute a means of violating Section 951, it is acting at the direction of a foreign government that matters and not the content of that act. *See Duran*, 596 F.3d at 1295; *Dumeisi*, 424 F.3d at 581.

Every court to consider an overbreadth challenge to Section 951 has rejected it. In *United States v. Hung*, 629 F.2d 908, 920 (4th Cir. 1980), the Fourth Circuit rejected vagueness and overbreadth claims directed at Section 951 because the term "agent" in Section 951 is "a readily understandable term which provides adequate notice of the conduct proscribed by statute." And in *Alshahhi*, the court rejected an overbreadth challenge because "Section 951 regulates conduct, that is, *acting* as a foreign agent." 2022 WL 2239624, at *5–*6. Similarly, in *United States v. Ji Chaoqun*, 2020 WL 1689826, at *3 (N.D. Ill. Apr. 7, 2020), the court rejected an overbreadth challenge to Section 951 because several provisions of the statute, including the requirement that the agent "agrees to operate . . . subject to the direction or control of a foreign government or official," the exceptions identified in the definition of agent, and the notification requirement all sufficiently guard against unconstitutional overreach.

Because Section 951 regulates conduct, "reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected

conduct" affecting American national security, and does not reach a "substantial" amount of protected speech relative to its "plainly legitimate applications," *Hicks*, 539 U.S. at 119, it is not overbroad.

## IV.   CONCLUSION

In view of the foregoing, the United States respectfully requests that the Court deny the Defendants' Motion to Dismiss.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: *s/ Daniel J. Marcet*
DANIEL J. MARCET
RISHA ASOKAN
Assistant United States Attorneys
Florida Bar No. 0114104
400 N. Tampa St., Ste 3200, Tampa, Florida
813/274-6000 | Daniel.Marcet@usdoj.gov

JENNIFER K. GELLIE
Acting Chief, Counterintelligence
and Export Control Section

By: *s/ Menno Goedman*
MENNO GOEDMAN
Trial Attorney, National Security Division
950 Pennsylvania Ave. NW, Washington, DC
(202) 451-7626 | Menno.Goedman@usdoj.gov

COREY R. AMUNDSON
Chief, Public Integrity Section

By: *s/ Demetrius D. Sumner*
DEMETRIUS D. SUMNER
Trial Attorney, Public Integrity Section
PA Bar No. 321406
1301 New York Ave., Washington, D.C.
202/597-0775 | Demetrius.Sumner2@usdoj.gov

**U.S. v. Ionov, et al.**                    **Case No. 8:22-cr-259-WFJ/AEP**

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2023, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

> Ade Griffin, Esq.
> Leonard Goodman, Esq.
> Mutaqee Akbar, Esq.
> Daniel Hernandez, Esq.

> */s/ Daniel J. Marcet*
> Daniel J. Marcet
> Assistant United States Attorney
> Florida Bar No. 0114104
> 400 N. Tampa St., Ste. 3200
> Tampa, FL 33602-4798
> Telephone: (813) 274-6000
> E-mail: Daniel.Marcet@usdoj.gov