1                     IN THE UNITED STATES DISTRICT COURT

2                         MIDDLE DISTRICT OF FLORIDA

3                              TAMPA DIVISION

4

5   UNITED STATES OF AMERICA,          )
                                        )
6              Plaintiff,               )
                                        )
7        vs.                            )  Criminal Docket
                                        )
8   PENNY HESS, et al.                  )  No. 8:22-cr-259-WJF-AEP
                                        )
9              Defendants.              )
    _____)

10

11                    Transcript of Motion to Dismiss

12

                              Heard in Courtroom 10A
13              Sam M. Gibbons United States Courthouse
                          801 North Florida Avenue
14                          Tampa, Florida 33602
                        Thursday - September 28, 2023
15                        9:42 a.m. - 12:00 p.m.

16

17

                    BEFORE THE HONORABLE ANTHONY E. PORCELLI
18
                       UNITED STATES MAGISTRATE JUDGE
19

20

21                       SUSIE K. CAYLER, RPR
                        Federal Official Court Reporter
22              Sam M. Gibbons United States Courthouse
                    801 North Florida Avenue, Room 1221
23                       Tampa, Florida 33602
                        reportercayler@gmail.com
24                          515.778.5008

25                Proceedings recorded by machine shorthand
          Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2

PRESENT ON BEHALF OF THE PLAINTIFF,
3  THE UNITED STATES OF AMERICA:

4        DANIEL MARCET
         RISHA ASOKAN
5        US Attorney's Office
         Suite 3200
6        400 N. Tampa Street
         Tampa, Florida 33602
7        813.274.6000
         daniel.marcet@usdoj.gov
8        risha.asokan2@usdoj.gov

9        DEMETRIUS SUMNER
         US Department of Justice, Public Integrity Section
10       1301 New York Avenue, Suite 10th Floor
         Washington, D.C. 20530
11       202.597.0775
         demetrius.sumner2@usdoj.gov

12

13
PRESENT ON BEHALF OF THE DEFENDANT,
14  PENNY HESS:

15       LEONARD GOODMAN
         Len Goodman Law Office, L.L.C.
16       53 W. Jackson Boulevard, Suite 1650
         Chicago, Illinois 60604
17       312.986.1984
         lcgoodman@rcn.com
18
PRESENT ON BEHALF OF THE DEFENDANT,
19  JESSE NEVEL:

20       MUTAQEE AKBAR
         Akbar Thomas
21       P.O. Box 10143
         Tallahassee, Florida 32302
22       850.383.0000
         m.akbar@akbarthomas.com

23

24

25

**APPEARANCES**

PRESENT ON BEHALF OF THE DEFENDANT,
OMALI YESHITELA:

      ADE GRIFFIN
      THOMAS INSKEEP
      Griffin Inskeep Law, L.L.C.
      224 Datura Street, Suite 900
      West Palm Beach, Florida 33402
      561.320.6006
      adc@agilaw.com

PRESENT ON BEHALF OF THE DEFENDANT,
AUGUSTUS ROMAINE, JR.:

      DANIEL HERNANDEZ
      Law Office of Daniel Hernandez
      902 N. Armenia Avenue
      Tampa, Florida 33609
      813.875.9694
      info@danielmhernandezpa.com

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2          (Proceedings began at 9:42 a.m.)

 3          (Open court.)

 4          (Defendants Hess and Nevel present.)

 5          (Court called to order.)

 6              THE COURT:  Good morning.  Give me one moment,

 7  please.

 8              Good morning.  Let's call the case, please.

 9              COURTROOM DEPUTY:  Certainly.

10              This is United States versus Omali Yeshitela -- I'm

11  sorry if I'm mispronouncing that -- USA versus Penny Joanne

12  Hess, USA versus Jesse Nevel, and USA versus Augustus Romain,

13  Jr.  Case number 8:22-cr-259-WFJ-AEP.

14              THE COURT:  Thank you.

15              Let me have counsel state your appearances for the

16  record, starting with the government, please.

17              MR. MARCET:  Good morning, Your Honor.

18              AUSA Daniel Marcet and Risha Asokan on behalf of the

19  United States, joined by trial attorney, Demetrius Sumner from

20  the Public Integrity Section, also on behalf of the United

21  States.

22              THE COURT:  Good morning to you all.

23              Let's just start in order as you're seated, please.

24              MR. GOODMAN:  Leonard Goodman, attorney for Penny

25  Hess.
```

```
 1              THE COURT:  And your client, Mr. Goodman?

 2              MR. GOODMAN:  Right there (indicating.)

 3              THE COURT:  Good morning, Ms. Hess.

 4         Good morning, Mr. Goodman.  Thank you.

 5              MR. AKBAR:  Good morning, Your Honor.  Mutaqee Akbar

 6  here on behalf of Mr. Jesse Nevel.

 7              THE COURT:  Good morning, Mr. Nevel.  No need to

 8  stand.  Thank you.

 9         Thank you, Mr. Akbar.

10              MS. GRIFFIN:  Good morning.  Ade Griffin and Tom

11  Inskeep on behalf of Omali Yeshitela.

12              MR. HERNANDEZ:  Good morning, Your Honor.  Daniel

13  Hernandez on behalf of Augustus Romain.

14              THE COURT:  Good morning to all.  Thank you.

15         I scheduled this matter based upon the motion that

16  was filed by the defendants for dismissal of the indictment.

17         Ms. Hess filed the original motion, which was later

18  joined by the other defendants.  The government has filed a

19  response, and the reply has also been filed.

20         What I intend to do, Mr. Goodman, is I'm going to

21  recognize you, since you've started the matter with the initial

22  motion, allow you to make any arguments that you want to

23  proceed with.  I'll then recognize the other defendants through

24  their lawyers to make any additional arguments.

25         What I'd like to avoid is the repetition of any
```

1    arguments.  So if there is anything beyond what Mr. Goodman has

2    argued, please feel free to -- or if you want to reinforce

3    something for the record, please feel free to do so.

4         Then I'll recognize the government for its response

5    and then any reply to that.

6         Mr. Goodman, are you prepared to proceed?

7         MR. GOODMAN:  Yes, Your Honor.

8         THE COURT:  If you feel more comfortable to remain

9    seated, or you can go to the podium.

10        MR. GOODMAN:  Thank you, Your Honor.

11        May it please the Court, counsel.

12        My name is Leonard Goodman, I represent Penny Hess.

13        Your Honor, this motion to dismiss clearly asks for

14   extraordinary relief to dismiss the indictment.  I've never

15   filed such a motion in a federal case.  I've been practicing

16   for over 25 years in federal court, and I've never before seen

17   an indictment that targets political speech.

18        What the government is doing here has never been done

19   before.  This is an extraordinary case.  I would argue that

20   it's un-American, what the government is doing.

21        The defendants are part of an activist group that

22   have been around for some 50 years.  There's no history of

23   violence.  They are harsh critics of the United States

24   Government and foreign policy.  They're harsh critics of the

25   western powers and NATO.  They always have been in their 50-

1   year history.

2       The indictment, which must be taken as true for

3   purposes of this motion, makes the following allegation:  It

4   alleges that in 2015, the chairman of the African People

5   Socialist Party was invited to Moscow, after which his party

6   entered into a partnership agreement with Codefendant Ionov, a

7   Russian national, which the government alleges is connected to

8   the Kremlin.

9       There's no details provided about the nature of this

10  agreement that was entered into.  According to the indictment,

11  Mr. Ionov described it in a conversation that the government

12  intercepted as a bilateral cooperation agreement.

13  Mr. Yeshitela described it as an alliance with Mr. Ionov.

14      The indictment alleges that the African People

15  Socialist Party, these three defendants, received about $7,000

16  in funding from Mr. Ionov, or his organization, over about six

17  years of their relationship.  Most of this money was to cover

18  expenses at a 2016 four-city speaking tour that the African

19  People's Socialist Party organized to promote the issue of

20  reparations, which is an issue that they have championed for

21  most of their existence.

22      The overt acts in the indictment all involve -- with

23  respect to our clients, the African People's Socialist Party,

24  all involve political speeches.  The defendants are charged

25  with making speeches, organizing peaceable rallies, and

1       publishing articles in their own newspaper.

2               So just to go through these very quickly, the overt

3       acts.  Overt acts 8 through 12 allege that in 2015 --

4               THE COURT:  Before you do that, let me just ask.

5               So is your position, then, the conduct that is

6       prohibited by the statute itself, that is 951, speech is not

7       contemplated at all, or it is that it's so overbroad that

8       that's the infringement upon the speech?

9               MR. GOODMAN:  The 951 targets action, right on its

10      face, targets acts, not speech.  And courts have commented on

11      that directly, it talks about conduct.

12              Therefore, when it's been challenged as being

13      overbroad, the courts have said, well, any -- the statute only

14      applies to actions, so any infringement of political speech is

15      just incidental to the statute.

16              THE COURT:  So is then the argument, for at least

17      that aspect of it, just simply there's an insufficiency of

18      evidence to demonstrate any act occurred to be in violation of

19      the statute, that if all that is alleged in the indictment is

20      speech, then there is no prohibitive conduct?

21              MR. GOODMAN:  Well, the -- this statute, which is

22      clearly directed at conduct, not speech, is being used in this

23      case to target speech, not action.  So in that sense, it

24      violates the First Amendment.

25              I'm not really talking about what the evidence is

1    here.  We haven't gone to trial.  I'm talking about the four

2    corners of the indictment.  The indictment itself says the

3    defendants entered into an agreement with this Russian

4    national, to do what?  Not to do any action on behalf of

5    Russia, not to commit espionage, not to commit -- not to help

6    them -- relief from sanctions, but to make political speeches,

7    so in that sense this case directly targets political speech.

8              THE COURT:  The indictment, as you're arguing,

9    targets speech.  But what I'm asking you is, independent of

10   whether it's political speech or not, if it's just simply

11   speech and not action, is it part of the argument, simply, that

12   there is an insufficiency of the evidence, as alleged in the

13   indictment, to prohibit any actions?

14             MR. GOODMAN:  I would agree with that.  I would agree

15   with that.

16             Obviously the motion focuses on the First Amendment,

17   the fact that the government cannot do what they're trying to

18   do in this case because of the First Amendment, but what you're

19   saying is correct.

20             THE COURT:  All right.  You may proceed.  Thank you.

21             MR. GOODMAN:  Overt Acts 8 through 12 allege that in

22   2015, the African People's Socialist Party supported a petition

23   to the U.N., alleging that the United States had committed

24   genocide.

25             Overt Acts 19 through 26 involve the 2016 four-city

1   tour that was organized by the African People's Socialist Party

2   on the issue of reparations.

3            Overt Act 30, that the party published an article

4   criticizing the decision to ban Russia from the Olympic games.

5            Overt Act 31 and 45 through 52, the party -- the

6   defendant, Jesse Nevel, ran for local office in St. Petersburg.

7   No allegation that this had anything to do with Russia, or that

8   Russia had anything to do with the campaign, the issues, or the

9   reason to -- or the decision to run.

10           Overt Act 56.  The year 2020, the African People's

11  chairman spoke at a Dialogue of Nations Zoom conference that

12  was hosted by Ionov.

13           Overt Act 58.  May of 2020, the African People

14  Socialist Party recorded a video message congratulating the

15  residents of Russian-backed Donetsk People's Republic.

16           Overt Acts 68 to 70.  February, March of 2022, the

17  African People Socialist Party Defendant made speeches

18  criticizing U.S. and NATO involvement in the crisis in Ukraine.

19           These are what's targeted in the indictment.  This is

20  not in dispute.  It's plain on the face of the indictment.  All

21  these speeches are public speeches, nothing was done in secret.

22           In its response, the government invents an allegation

23  that the defendants are also charged with conspiring to help

24  lobby to free Russian detainees.  This is not in the

25  indictment.  And I would submit that this is a desperate

1    attempt to save this indictment, and a recognition that the

2    government stands on dubious legal ground in bringing this case

3    targeting speech.

4            I should also point out, Mr. Romain is in the

5    courtroom, but my argument today is only on behalf of the three

6    African People Socialist Party defendants.

7            And the reason why I want to make this clear is

8    because there is no overlap between the charges against them

9    and the charges against Mr. Romain.

10           Mr. Romain was, at some point, a member of the

11   African People's Socialist Party, but he left and formed his

12   own group.  And all of the overt acts charged against

13   Mr. Romain have to do with conduct of his organization.

14   There's no overlap.  He's not charged with any of the stuff

15   that we did, we're not charged with any of the stuff he did.

16           So whether or not you can make the same arguments for

17   Mr. Romain, that this is all targeted speech, I can't make that

18   argument.  His lawyer would have to make that.

19           Every other 951 prosecution that we could find

20   targets secret operatives for foreign governments, not public

21   speech.  And we mentioned some of these cases in the motion.

22           There's the recent *Rafiekian* case which involved a

23   secret agreement with the government of Turkey to foster the

24   extradition and prosecution of a Turkish preacher that was

25   living in Pennsylvania, who Erdogan, the president of Turkey,

blamed for an attempted coup.  *United States v. Campa*, which is

a case where the defendant was charged under 951 with espionage

on behalf of Cuba.  United States v. *Dumeisi*, that's an

espionage case on behalf of Iraq.

THE COURT:  Help me understand the distinction

between that case and this case.

What do you think is distinct there?  Because clearly

articles are being published, speech is at issue, so what are

the distinguishing facts in that case to here?

MR. GOODMAN:  Sure.  *Dumeisi* is -- was a publisher,

as you correctly noted, of an Arabic-language newspaper in

Chicago or the Chicago area.

He was charged with acting as a -- acting as a secret

agent for Iraq.  And he challenges the sufficiency of the

evidence.  And the Seventh Circuit found that there was

sufficient evidence to show three actions on behalf of Iraq --

Iraqi intelligence.  The one that he had submitted reports to

Iraqi intelligence on Iraqi intelligence members living in the

United States, that he had printed provocative articles in

order to gain information about dissidents -- Iraqi dissidents

living in the United States, and that he had produced false

press passes for Iraqi officials.

And in that case, the Seventh Circuit also addressed

the defendant's concern that his articles and speeches were

considered by the jury in violation of the First Amendment.

1    And the Seventh Circuit noted that the jury was properly

2    instructed, that Dumeisi's speeches, his newspaper articles,

3    and his political views were protected by the First Amendment.

4    And, quote, are to be considered only insofar as they pertain

5    to issues of motive and intent.  Therefore, the jury was

6    allowed to consider his publishing his newspaper articles, if

7    they were part of some scheme to discover information about

8    Iraqi dissidents.

9         THE COURT:  But it further reads:  Given that an

10    element of 951 is acting subject to the direction or control of

11    a foreign government or official.  And there was evidence

12    suggesting that Dumeisi published articles at the behest of the

13    IIS.  We find this publication relevant and agree with the

14    district court that Dumeisi's proposed instruction would have

15    been misleading as to the law.

16         I read that to say, that's relevant evidence to show,

17    just as instructed, the motive and intent of the publication,

18    and was it at the direction of a foreign government.

19         MR. GOODMAN:  Correct.  But it was because he was

20    publishing articles that were designed to gain information, to

21    attract attention of dissidents living in the United States, in

22    order to prepare his reports for Iraqi intelligence.  So, yes,

23    those articles that were published on behalf of Iraqi

24    intelligence were relevant, but not as -- not as political

25    speech, only because --

 1          THE COURT:  So what would be the motive here for the

 2  publication of the articles?

 3          MR. GOODMAN:  Here?

 4          THE COURT:  In your theory, what's the motive in this

 5  case for the publication of the articles?

 6          MR. GOODMAN:  For publication of articles?

 7          THE COURT:  Yes.

 8          MR. GOODMAN:  Which particular articles are you

 9  referring to?

10          THE COURT:  Any that publish speech that are at issue

11  here.

12          MR. GOODMAN:  They publish a newspaper, I think

13  bimonthly, for 30 years, called the Burning Spear.  They

14  publish articles --

15          THE COURT:  The government alleges that Ionov

16  provided articles to be published, does it not?

17          MR. GOODMAN:  I think there was one article that they

18  published.

19          THE COURT:  So what would be the motive behind that

20  publication?  Isn't that --

21          MR. GOODMAN:  It was an article that fit within their

22  ideology and they agreed to publish it.  I mean, they're a

23  political organization.  And they publish guest articles all

24  the time from people, so --

25          THE COURT:  But isn't that a question of fact, what

1    would be the motive?

2            MR. GOODMAN:  I don't know what the government is

3    suggesting the motive would be, other than political speech.

4            It was a political article.  I don't remember which

5    particular one --

6            THE COURT:  I think one plausible argument would be

7    dissidence.

8            MR. GOODMAN:  That they're trying to --

9            THE COURT:  That could be the government's argument

10   or position.

11           MR. GOODMAN:  Well, it's not in the indictment, that

12   they published articles to somehow aid -- there's no allegation

13   in the indictment that these defendants acted in any way as

14   secret spies for Russia.  There's no allegation in the

15   indictment.

16           They published political articles that align with

17   their ideology, as they've done for 30 years.

18           THE COURT:  I'm going to disagree on that.  I

19   construed the entire indictment that's the whole purpose, that

20   they're acting on behalf of a foreign government without

21   registering.  Isn't that the whole concept of doing so in

22   secret?

23           MR. GOODMAN:  But publishing an article, in and of

24   itself, a political article, is protected speech.  Even a

25   Russian has First Amendment rights, even a foreigner has First

1   Amendment rights in this country.

2          THE COURT:  But doesn't the question go to why the

3   publication?  If it's just for the expression of the genuine

4   belief and expression, that's one thing, or is it done at the

5   behest of a foreign actor for their purposes, that may be

6   another, is it not?

7          MR. GOODMAN:  For what purpose?  Other than to make a

8   political statement and to get their political point of view

9   before an American audience.  That's protected speech,

10  Your Honor.

11         Now, if there was some nefarious purpose, as there

12  was in the *Dumeisi* case, then, yes, you're correct.  But that's

13  not alleged here.  There is no allegation that these defendants

14  are secret operatives for Russia.

15         THE COURT:  So your argument is that Ionov, who was

16  instructing -- allegedly instructing, had no nefarious purpose?

17         MR. GOODMAN:  I don't know what his purpose was.  But

18  our -- I can only talk about my clients, and their purpose was,

19  if they agreed something fit their ideology and they wanted to

20  publish it, they published it.

21         THE COURT:  But, again, can the government not make a

22  different argument on these facts?

23         MR. GOODMAN:  But it's not in the indictment.  That's

24  what this case is about --

25         THE COURT:  Why does it have to be in the indictment?

 1          MR. GOODMAN:  Because the indictment says they

 2   publish political speeches and political articles, that is

 3   protected speech.  Now, if they're saying there was some

 4   nefarious purpose, as it was in the *Dumeisi* case.

 5          THE COURT:  Do they not allege disinformation of

 6   propaganda?

 7          MR. GOODMAN:  I'll get to that in a moment, if I may.

 8          THE COURT:  Yes.

 9          MR. GOODMAN:  But there is no -- there's no

10   allegation that they were publishing articles for any purpose

11   other than the fact that it aligned with their political

12   ideology, which is protected speech.

13          Now, of course, it's not surprising that there are no

14   other cases that target political speech, any other 951 cases,

15   because the statute is quite clear on its face.  It says,

16   whoever, other than a diplomat -- diplomatic, or a counselor

17   officer, or attache acts in the United States as an agent of a

18   foreign government without prior notification to the Attorney

19   General, if required, shall be fined under this title or

20   imprisoned not more than ten years.  Acts, not speech.

21          In support of our motion to dismiss, we cite half a

22   dozen Supreme Court cases that say very clearly that what the

23   government is trying to do in this indictment violates the

24   First Amendment.

25          I just want to talk about a couple of those cases

1   right now, if I may.

2           The first is *De Jonge v. Oregon*, a 1937 Supreme Court

3   case.   In that case, the defendant was prosecuted and jailed

4   for helping organize a peaceful public meeting under the

5   auspices of the Communist party.  The Supreme Court reversed,

6   and it said very clearly, this is 1937, peaceable assembly for

7   lawful discussion cannot be made a crime.  The holding of

8   meetings for peaceable political action cannot be prescribed.

9   Those who assist in the conduct of such meetings cannot be

10  branded as criminals on that score.

11          The question, if the rights of free speech and

12  peaceable assembly are to be preserved, is not the auspices

13  with which the meeting is held, but as to its purpose, and not

14  to the relations of the speakers, but whether their utterances

15  transcend the bounds of the freedom of speech with which the

16  Constitution protects.

17          So you look at their utterances, not at their

18  relationships.  Peaceable political speech cannot be made a

19  crime.  The fact that the speaker has a relationship to the

20  Communist party in *De Jonge* -- or in this case to Russia, as

21  alleged in this indictment -- does not justify suppression of

22  speech or criminalization of speech.

23          Now, of course, the First Amendment is not absolute,

24  as the court notes.  I mean -- and the court in *De Jonge*

25  recognizes, and all the Supreme Court cases recognize, there

 1   are circumstances where the government can sensor or even

 2   criminalize speech.

 3        They generally fall into three categories:  Speech

 4   that is used to commit a crime, and that's kind of what we were

 5   talking about with the *Dumeisi* case.  Speech that's used to

 6   commit espionage.  Speech that is obscene is not protected by

 7   the First Amendment, or speech that incites immediate

 8   lawlessness, or creates grave and immediate danger.  None of

 9   these facts are alleged in this case, in this indictment.

10        *Thomas v. Collins* is another case that we rely on,

11   that's a 1945 case.  And there, the defendant was imprisoned

12   under a Texas statute for failing to register as a labor

13   organizer before giving a speech encouraging workers to join

14   the union.  And the court said, in reversing his conviction, as

15   a matter of principle, a requirement of registration in order

16   to make a public speech would seem generally incompatible with

17   an exercise of the rights of free speech and free assembly.

18   Lawful public assemblies involving no element of grave or

19   immediate danger to interests of the state it's entitled to

20   protect are not instruments of harm, which require previous

21   identification of the speakers.

22        So how, then, does the government justify this

23   prosecution?  Well, it devotes about nine pages of its memo in

24   opposition to the argument that this prosecution doesn't target

25   speech, because Section 951 is content neutral, which we've

1   already discussed.  It's content neutral on its face, and,

2   therefore, any limitations on First Amendment freedoms must be

3   merely incidental.

4         I would submit, with all due respect to the

5   government, this is not a serious argument.  The government is

6   basically saying that because this statute, which was never

7   intended to target speech, is content neutral, which of course

8   it is because it targets actions not speech.  Therefore, we

9   can't possibly have used it to target speech.  There's nothing

10  to see here, Judge.  That's basically what they're arguing.

11        Now, as the Eastern District of New York said

12  recently --

13        THE COURT, I need a little more help there because I

14  think we're blurring the lines of my initial question to you,

15  which is just to define actions of speech, because that blurs

16  the argument of content neutral.

17        Explain to me, then, putting aside whether the

18  statute regulates speech or not, why would it not be content

19  neutral?  In other words, it doesn't prescribe any specific

20  speech or limit any specific speech, so why should I not

21  construe the statute as content neutral?

22        MR. GOODMAN:  I would agree with you that the statute

23  is content neutral.

24        As the Eastern District of New York said recently in

25  the *Alshaw* case, Section 951 regulates conduct that is acting

1   as a foreign agent, therefore, its effect on speech would be

2   only incidental to its primary effect on conduct.  That was in

3   respect to another case where the defendants were charged with

4   acting on behalf of a foreign government, but they made a First

5   Amendment challenge to the statute, and the judge said that the

6   statute is okay.

7          But, Your Honor, it is well established, and the

8   Supreme Court has repeatedly held, that a facially

9   content-neutral law will be considered a content-neutral

10  restriction when it's used to target speech.

11         We cite a couple cases, first is *Cohen v. California*,

12  a 1971 case.  And there the defendant was convicted of Breach

13  of Peace for wearing a jacket displaying an offensive word to

14  protest the Vietnam war and the draft.

15         The statute, the Breach of Peace statute, was content

16  neutral on its face, but the Supreme Court recognized that it

17  was being used by the prosecutors in California to target the

18  offensive message on this man's jacket.  Thus, the Supreme

19  Court applied strict scrutiny, the state was required to show a

20  compelling interest to stop this person from delivering this

21  message, and it could not meet that burden.  The conviction was

22  reversed.

23         *Meyer v. Grant*, a 1988 case.  In that one, the

24  Supreme Court struck down a Colorado law that made it a felony

25  to pay petition circulators to obtain signatures to get a

1  resolution on the ballot in Colorado.  The law itself was

2  content neutral, but the Supreme Court found that it restricted

3  political expression.

4          THE COURT:  I want to go back to *Cohen* for a moment

5  so you can help me understand.

6          So the simple expression of wearing the jacket in

7  opposition to the draft, and the court said specifically it

8  finds the conduct at issue is simply speech, but is that the

9  case here where it's both the speech and the failure to

10  register that is at issue, it's not just the speech alone?

11          MR. GOODMAN:  Well, the registration issue was -- you

12  know, I will address that because it's the -- I'm trying to

13  remember the case -- but the registration issue the Supreme

14  Court looked at, and that's the union organizer case, where

15  they said if somebody is making a lawful speech, it is

16  unconstitutional to require them to register in order to make a

17  political speech.  That's the situation here.

18          Now, certainly the government has interest to -- to

19  have a registration requirement for secret spies operating on

20  behalf of foreign governments, but that's not the allegation

21  here.  The allegation is they had an alliance with Russia to

22  pull it -- to make political speeches.

23          If I may continue with *Meyer v. Grant*.

24          What's significant about that case, Your Honor, is

25  that the Supreme Court found that this content-neutral law

 1    about petition circulators was restricting political speech.

 2    And, thus, it applied strict scrutiny.  And this is the way the

 3    Supreme Court described the government's burden in that case.

 4    Quote, the statute trenches upon an area in which the

 5    importance of First Amendment protections is at its zenith.

 6    For that reason, the burden that Colorado must overcome to

 7    justify this criminal law is well nigh insurmountable.

 8          That's what the government faces under strict

 9    scrutiny when it targets political speech, as it has done in

10    this indictment.

11          The *Dumeisi* case also directly refutes the

12    government's argument, because in that case the Seventh Circuit

13    said very clearly, and the jury was instructed, and the Seventh

14    Circuit said this was a proper instruction, that the

15    defendants -- I think there was some quibble about the

16    defendant wanted a different instruction and the court held

17    that the instruction that was given was --

18          THE COURT:  Well, the defense instruction that was

19    requested is akin to your argument, which is it's not a

20    violation of 951 to publish a news article.

21          MR. GOODMAN:  Right.  Right.

22          And basically what the court said is, yes, the

23    instruction that was actually given was sufficient.  So the

24    instruction that was given -- let me read it to you,

25    Your Honor.

1          This is the instruction that was actually given after

2     the defendant expressed concerns:  The First Amendment to the

3     Constitution protects the right to free speech and the freedom

4     of the press.  This means that individuals are permitted to

5     express views that are controversial or even despicable.

6          The speech that Mr. Dumeisi gave at the Iraqi mission

7     and newspaper articles he authored or published are protected

8     by the First Amendment.  The speech and newspaper articles, as

9     well as Mr. Dumeisi's opinion and political views, are to be

10    considered only insofar as they may pertain to issues of motive

11    and intent.

12         The Seventh Circuit held that that was sufficient,

13    the instruction that the defendant asked for was unnecessary

14    because the judge had already covered it.

15         Let me address the issue of propaganda, the

16    allegation in the indictment that defendants are spreading

17    Russian propaganda and disinformation.

18         The government seems to be asking this Court to find

19    that this allegation in the indictment takes away First

20    Amendment protections from the defendants.

21         This argument is not well developed, it's not

22    supported by any case law, and it simply doesn't hold water.

23         We cite *NAACP v. Button* in response.  And that's a

24    case where the State of Virginia attempted to obstruct the

25    NAACP's political strategy of using a litigation -- of using

1   litigation to eliminate racial barriers by criminalizing the

2   solicitation of any legal or professional business.

3          The State argued that the -- that their statute

4   targeting solicitation is wholly outside the area of freedoms

5   protected by the First Amendment.  The Supreme Court disagreed.

6   And it noted that for the NAACP, litigation is a form of

7   political expression.  And it commented, also, that a state

8   cannot foreclose the exercise of constitutional rights by mere

9   labels, which is what the government is trying to do here.

10          They're saying this is not protected speech.  This is

11   Russian propaganda and disinformation.

12          And in the motion to dismiss, we point out that what

13   the government has labeled as Russian propaganda and

14   disinformation are identical to the views expressed by

15   well-renowned public intellectuals, such as Professors Jeffrey

16   Sachs of Columbia University, John Mearsheimer of the

17   University of Chicago.

18          It's also -- it's also identical to views expressed

19   by the defendants in the Burning Spear newspaper, as I point

20   out, in a 2014 article that's almost identical to the arguments

21   that they make later.  2014 is a year before they had any

22   relationship with Russians.

23          So in its response memo, the government indicates

24   that it intends to call an expert witness to support a new

25   definition of propaganda and disinformation, because now the

1   government is conceding, well, we're not saying it's not true

2   what they're saying, it's the same thing that these public

3   intellectuals are saying about NATO expansion, the U.S.

4   involvement in Ukraine, and the coup in 2014.

5         We're not saying these are not true, we're saying

6   we're going to bring in an expert to say that this is somehow

7   outside the First Amendment, that this is Russian trade craft,

8   apparently.  There's no case law to support this.

9         It's quite dangerous, in my view, Your Honor, to say

10  that this type of speech -- we're going to label it something

11  else and, therefore, we're going to take away your First

12  Amendment rights.

13        That's what they tried to do in *NAACP v. Button* by

14  saying solicitation is not speech.  The Supreme Court said, no,

15  you can't do that.

16        So if I may, to sum up, Your Honor.

17        This indictment targets political speech.  This Court

18  must apply strict scrutiny.  And the government must show a

19  compelling interest to target -- criminalize the speech of

20  these activists, nonviolent activists.

21        The government cites two cases that sort of address

22  this issue.  They make the suggestion, well, even if we have to

23  show a compelling interest, we can do it.  And they cite two

24  cases and I want to address those two cases.

25        The first is the *Communist Party of the United States*

1    *v. Activist Control Board.*   This is a 1961 case.   This was a

2    challenge to the McCarran Act, which created the Subversive

3    Activities Control Board.   And the government notes that in

4    that case, the Supreme Court upheld a registration requirement

5    for the Communist party back in 1961.   I have two comments

6    about this case.

7           First, the Supreme Court made clear that its ruling

8    was based on a Congressional finding that there exists a world

9    Communist movement, foreign controlled, which operates to

10   overthrow our existing government by force, if need be, and to

11   establish in its place a Communist Totalitarian Dictatorship.

12          There are no such findings in this indictment

13   referred to in this case.   And there's no allegation that these

14   defendants are proposing violent overthrow or a Communist

15   Totalitarian dictatorship.   It's simply not the case.   This is

16   not a national security case.

17          Further, I would point out that in 1968, Congress

18   removed the requirement that Communist organizations had to

19   register with the Attorney General.   And, of course, the

20   Subversive Activities Control Board has been disbanded.

21          The other case that the government points to in

22   support of its argument -- we could show a compelling interest,

23   in the *Holder v. Humanitarian Law Project*.   And there the

24   Supreme Court upheld the defendant's conviction for material

25   support of a terrorist organization, even though the defendant

1    had only supported the organization's lawful, nonviolent

2    activities.

3            And in rejecting the defendant's First Amendment

4    challenge, the Supreme Court relied, again, on a Congressional

5    finding that all contributions to foreign terrorist

6    organizations further their terrorism.  They said, based on

7    that finding, we find that there's a compelling government

8    interest to restrict its First Amendment activities to support

9    this group.

10            Again, Your Honor, this is not a national security

11   case.  These defendants -- their group has been around for 50

12   years.  It's a nonviolent organization.  It doesn't advocate

13   the overthrow of the U.S. Government, it doesn't advocate

14   totalitarianism.  And I should also point out that Russia is no

15   longer a Communist state.

16            So there simply is no basis for the government to

17   say, well, if you have any relationship with Russia you lose

18   your First Amendment rights.  And that is really the message

19   from *De Jonge*, that you can have a relationship -- your

20   relationships don't matter, it's the content of the speech.  Is

21   it protected speech?  If, yes, it's political speech.  It's the

22   core value of the First Amendment and the government has to

23   show a compelling or almost insurmountable interest to

24   criminalize that speech.

25            THE COURT:  Do you have an argument if I was to apply

1    intermediate scrutiny?

2              MR. GOODMAN:  I don't see a basis for intermediate

3    scrutiny.  I mean, that's -- like the *O'Brien* case, something

4    applied to, you know -- I think the *O'Brien* case was -- first

5    of all, intermediate scrutiny is like time, place, and manner

6    restrictions, like the height of billboards in a town.  They

7    only incidentally restrict speech.

8              This indictment targets speech.  If you go over the

9    overt acts, they all involve political speech.

10             THE COURT:  The government's argument is it only

11   limits time, place, and manner.

12             MR. GOODMAN:  I don't even understand that argument,

13   honestly, Your Honor.

14             I mean, time, place, and manner that they can't speak

15   in the United States, but they could speak in another country?

16   I'm not sure exactly what that means.

17             THE COURT:  Well, how does the statute prevent them

18   from speaking after they're registered?

19             MR. GOODMAN:  Well --

20             THE COURT:  Is it the manner?

21             MR. GOODMAN:  Under the Supreme Court, they have no

22   obligation to register in order to make political speeches.

23   The Supreme Court was very clear on that.

24             THE COURT:  But that's not my question.

25             How does the statute prohibit speech at all other

1    than the manner?

2           MR. GOODMAN:  Well, we don't know, because I don't

3    know that anyone has ever actually ever registered under 951.

4    I mean, I suppose this could be a different matter, the

5    government could have sent them a letter saying, we think you

6    need to register under FARA, or something like that, and then

7    there could've been a discussion, but that's not what they did.

8    They raided their headquarters and then they indicted them with

9    a criminal indictment with a crime that carries up to 10 years

10   punishment.

11          THE COURT:  I'm only looking at the face of the

12   statute.  Other than requiring the registration before speech,

13   is there any prohibition of speech, an absolute prohibition?

14          MR. GOODMAN:  Again, I don't know.

15          Our position is the Supreme Court has spoken very

16   clearly on that.  There is no requirement to register.  Now, if

17   they had registered as foreign agents, could they then have

18   delivered their speeches?  I suppose so.

19          THE COURT:  I still don't understand your argument

20   that I should apply strict scrutiny, but I want to ask again.

21          There is no argument under intermediate scrutiny, in

22   other words, a factual argument to be made?  In other words,

23   would the statute survive under intermediate scrutiny?

24          MR. GOODMAN:  No.

25          Again, Your Honor, I'm not talking about the statute

 1   being overturned here.

 2          THE COURT:  As applied here?

 3          MR. GOODMAN:  As applied, yes.

 4          I think it needs to be limited.  And you could look

 5   at the *Jeffrey Skilling* case, the *Enron* case where the Court

 6   did exactly that.  They looked at the Honest Services Statute

 7   and they said --

 8          THE COURT:  Please don't bring that statute into

 9   this.

10          MR. GOODMAN:  Well, but they said that they're not

11   going to strike it down, but they're going to limit it to only,

12   I think, bribes and kickbacks.  So that's basically what we're

13   saying here.  And that's exactly -- we cite the FISA statute,

14   which Congress did exactly that.  They said this doesn't apply

15   to political speech.

16          So to sum up again, this is a case about political

17   speech, at its core, protected by the First Amendment.  And as

18   the Supreme Court said, that rather than putting society in

19   danger by making political speeches, which the government would

20   have to show in order to justify this indictment -- this is

21   from *Dombrowski v. Pfister*, a Supreme Court from 1965.

22          The Supreme Court said, free expression is of

23   transcendent value to all society and not merely to those

24   exercising their rights.

25          The government seeks --

1          THE COURT:  Can I interrupt one more time?  I'm

2    sorry.

3          MR. GOODMAN:  Sure.  Of course.

4          THE COURT:  I'm curious, did you look at the

5    *Stromberg* case, *v. People of California*?  It was cited in the

6    *Cohen* case.  It's a 1931 case.

7          Did you have an opportunity to look at that?

8          MR. GOODMAN:  I did not look at *Stromberg*.

9          THE COURT:  That's fine.  You may continue.

10         MR. GOODMAN:  The government here seeks to criminally

11   prosecute members of the activist group that are harsh critics

12   of U.S. foreign policy.  Not for committing any crimes, but for

13   making speeches, organizing peaceable rallies, and publishing

14   articles critical of the government.

15         I can't think of a more dangerous indictment to allow

16   to proceed to trial.  I don't know the motive behind the

17   government's prosecution, but it clearly targets political

18   speech, which is -- the Supreme Court has repeatedly told us is

19   a core value of the First Amendment.

20         Strict scrutiny must be applied, and the government

21   has utterly failed to identify any compelling interest to

22   criminalize the defendants' political activity.

23         I just want to end with this quote.  This is from

24   *Roth v. United States*, a 1957 case -- I think *Roth v. United*

25   *States* is the one that talked about obscenity and how obscenity

 1   is not protected speech.  The Supreme Court said, the

 2   fundamental freedoms of speech and press have contributed

 3   greatly to the development and well-being of our free society

 4   and are indispensable to its continued growth.  Ceaseless

 5   vigilance is the watchword to prevent their erosion by Congress

 6   or by the states.

 7          The door barring federal and state intrusion into

 8   this area cannot be left ajar.  It must be kept tightly closed

 9   and opened only the slightest crack necessary to prevent

10   encroachment upon more important interests.

11          I would suggest that this case, Your Honor,

12   doesn't -- wouldn't just leave the door ajar.  This would blow

13   a hole in the First Amendment.  This is a prosecution of

14   critics of the U.S. Government, nonviolent, with no allegation

15   that there's any national security concern, except that they

16   somehow have a relationship with Russians.

17          Thank you, Your Honor.

18          THE COURT:  I do want to ask you --

19          MR. GOODMAN:  Sure.

20          THE COURT:  -- when you had made comment a moment ago

21   about motive as well -- and that's, candidly, one of the things

22   I'm struggling with.

23          So I looked up the *Stromberg* case.  And what this was

24   about was the raising of a red flag, and then the motive and

25   purpose behind the raising of a red flag.

 1              So the charge was unlawfully display a red flag and

 2   banner in a public place, and in a meeting place as a sign,

 3   symbol, or emblem of opposition to organized government and as

 4   an invitation and stimulus to anarchy, and as an aid to

 5   propaganda that is and was of a seditious character.

 6              The Supreme Court did not do a very thorough

 7   analysis, but the primary focus was on the first prong.  It

 8   ultimately set aside the conviction because it was unclear as

 9   to what basis the conviction was set upon on each of those

10   three additional requirements; the raising of the flag and then

11   the motive behind the flag.  Again, the first being to display

12   it as an emblem in opposition of organized government, the

13   second being an invitation to anarchy, and the third, as an aid

14   and propaganda that is and was of a seditious character.

15              The Supreme Court said there is no question that the

16   government can regulate the second and third prongs, but found

17   that the first was too big and unconstitutional.

18              Does motive matter here?  In other words, there's no

19   question about the speech, does it matter what the motive of

20   the speech was?

21              MR. GOODMAN:  I don't think so, Your Honor.

22              I mean, unless it was to commit a crime, espionage or

23   something like that.

24              I mean, the government uses the phrase in the

25   indictment, the defendants' speech sow discord.  I mean, that

1   is what political activists do, right, Your Honor?  They make

2   speeches.  They make people uncomfortable.  They make them

3   think about their government and what's wonderful about their

4   government and maybe what could be better about the government.

5   That's what activists do.  That's what the African People's

6   Socialist Party have been doing for 50 years.

7          Yeah, maybe you could call that sowing discord, but

8   that's the essence of political speech.  And the Supreme Court

9   has said again and again that that is valuable, that is the

10  essence of the First Amendment.  That's why it's the First

11  Amendment in our Constitution.  We want people to challenge, we

12  want them to make us think.  We don't want to stop this.

13         So I would be glad to read that case, I have not read

14  it, maybe in law school, but I would be happy to read about it,

15  if Your Honor would like, and submit something.

16         THE COURT:  We'll talk about that more.  All right.

17  Thank you.

18         Mr. Akbar, do you want to make any additional

19  arguments?

20         MR. AKBAR:  Thank you, Your Honor.

21         I don't want to repeat anything Mr. Goodman said,

22  because I think he covered it quite well.

23         I did want to go back to the *Dumeisi* case, because I

24  know the Court has questions in regard to that, and just my

25  reading of the case and how it applies to the facts that we

1   have.

2           It's just going back to what was instructed by the

3   Court.  Mr. Goodman read through it.  And what the Court's

4   analysis was, in the *Dumeisi* case -- or for that instruction,

5   it went specifically -- well, the last line I think is

6   important.

7           It says, the speech in newspaper articles, as well as

8   Mr. Dumeisi's opinion and political views, are to be considered

9   only insofar as they may pertain to issues of motive and

10  intent.

11          I think what's important is, to go back to the

12  beginning of the *Dumeisi* case, is what Dumeisi was under

13  prosecution for.  It wasn't just because of the articles, it

14  wasn't just because of the newspaper, it was also the

15  surveillance that took place with the pin that was used.  It

16  was the Bagdad file, what they described as the Bagdad file in

17  the case.  It was all type of like espionage-type behaviors and

18  actions that Dumeisi did.

19          And I think what -- my interpretation of what the

20  case is saying is that, you can use the articles that were

21  written in order to show his motive and intent -- so this is

22  going back to what the Court is saying now -- in order to show

23  his motive and intent as it pertains to those actions that he

24  was on trial for.

25          And so if you just have the newspaper articles and

1    you don't have anything to say what -- to go back to the

2    motive -- any actions for the motive and intent.  And this --

3    in our case, what's equivalent to the newspaper articles are

4    the specific articles that we have, but also what's being --

5    the overt actions in the indictment, which is running the

6    campaign, doing petitions, having a reparations tour.  All of

7    those things are the political speech that we're referring to,

8    which would only be relevant to show motive and intent for some

9    other action if there was some other action.

10          That's what our whole point is on this motion to

11    dismiss, is that the government has not alleged any other

12    action that could be considered an overt act.  All they have

13    alleged in their indictment is protected political speech.

14          So at the end of the case, if we went to a trial, the

15    Court would say their overt acts are only relevant to show

16    motive and intent.

17          THE COURT:  Well, what about Overt Act 18, that the

18    Russian government was, quote, more than likely using Ionov's

19    organization to engage, quote, the U.S. and Europe in serious

20    struggle and to, quote, utilize forces inside the U.S. to sow

21    to division within the U.S.?

22          MR. AKBAR:  There's no specific act on behalf of the

23    African People's Socialist Party in a way to equal an overt

24    act.

25          THE COURT:  Do you have to act under the

conspiracy -- if it's enough to show that was the agreement and the intent, isn't, then, the speech relevant to the motive as to what was happening?

MR. AKBAR:  If that was happening.  That's the thing, there was no actions connected to that.

It's kind of circular, because the government is saying the action is the speech, and that's the problem.  There is no other action other than the speech, and that's what's protected under the First Amendment.

And that's what I think *Dumeisi* points out, that Dumeisi couldn't be convicted just because of the newspaper articles that were written, even if somebody else told him to write those articles, because that was protected.  And that's what I'm saying specifically.  That's why the Court kept instructing the jury, you can't be convicted just for publishing articles or writing articles.

THE COURT:  So as I read it, after the instruction it reads, would be confusing, that is Dumeisi's requested instruction, because one of the allegations made by the government is that he acted by publishing certain articles that would enable him to identify opposition members, so that the motive was to identify opposition members.

MR. AKBAR:  Correct.

THE COURT:  So the government's theory here is the motive is dissidence.  Is that significant?  Should I consider

1   that?

2          MR. AKBAR:  No, Your Honor.  I don't believe that

3   it's -- one, I don't believe that in the indictment they're

4   saying Ionov said, publish these articles for dissidence or to

5   sow discord.  And it doesn't go as far as what's in *Dumeisi*.

6   And I think the behavior or the actions in *Dumeisi* is what's

7   connected -- that's the motive and intent for the actions in

8   there.  And there's no actions to match with the speech in our

9   particular case.

10         And so our position is that the action part is what's

11  missing in the indictment and should be dismissed.

12         So I just wanted to point out that part.

13         THE COURT:  Okay.  Thank you, Mr. Akbar.

14         Ms. Griffin?

15         MS. GRIFFIN:  May it please the Court.

16         THE COURT:  Thank you.

17         MS. GRIFFIN:  Good morning.

18         My name is Ade Griffin, along with Tom Inskeep for

19  Omali Yeshitela, who is known as a champion of the African

20  People's Socialist Party.

21         I don't have a whole lot to add this morning.

22  However, I did want to formally adopt the writ motions that

23  Mr. Goodman wrote and the motions from Mr. Goodman and

24  Mr. Akbar on behalf of Mr. Yeshitela Omali this morning.

25         THE COURT:  Let me just say, unless I'm

1    misunderstanding what's been requested, for the record, the

2    defendants have all adopted all pleadings related to this

3    issue.

4              So if I'm wrong about that, I want someone to speak

5    up.

6              MS. GRIFFIN:  Yes, Your Honor, you are correct.

7              We are asking and formally adopting the written

8    motions and also the oral arguments made this morning.

9              THE COURT:  Thank you.

10             MS. GRIFFIN:  And we're doing that on behalf of the

11   African People's Socialist Party, not on Mr. Romain.

12             Judge, I just want to remind the Court that we are

13   bound by the four corners of the indictment.  And I just found

14   it interesting that the government pointed that out on page 9

15   to Your Honor, that we are bound by the four corners of the

16   indictment.  And then went on later to discuss substantial

17   additional evidence that they may introduce at trial.

18             So I want to make sure that you're not considering

19   any speculative substantial additional evidence that the

20   government may intend to bring in trial for purposes of the

21   motion to dismiss, and that we are bound by the four corners of

22   the indictment.

23             That's really the only thing that I have to add.

24             And on behalf of Mr. Yeshitela, this case,

25   Your Honor, is about pure political speech and the right to

1    advocate dissenting views.

2           It's our position that if you allow this case to

3    proceed, we're essentially turning the person's actions,

4    seeking protection by the First Amendment, as a crime, and we

5    ask that it be dismissed and ask you to do so.

6           THE COURT:  All right.  Thank you.

7           Mr. Hernandez?

8           MR. HERNANDEZ:  I don't have anything, Your Honor.

9           THE COURT:  Who will be arguing for the government?

10          MR. MARCET:  I will, Your Honor.

11          THE COURT:  Mr. Marcet, before you begin, let me cut

12   to the one hard question.

13          Is the government taking the position that there is

14   any actions at issue in the indictment or are we just focusing

15   on speech?

16          MR. MARCET:  Judge, I would answer that in two ways.

17          I think to the extent we're just focusing on speech,

18   if that's Your Honor's view of the indictment --

19          THE COURT:  I'm not asking for my view, I'm asking

20   for your view and what your theory is.

21          MR. MARCET:  My view is that the indictment alleges

22   action and speech, and the evidence at trial will show actions

23   and speech.

24          The speeches engaged in here, they were not purely

25   speeches, they required, for example, traveling to certain

1    cities at the direction of the FSB.  They required allowing the

2    FSB to assist with the establishment of the infrastructure for

3    which -- through which those speeches were made, such as

4    setting up the website, providing a better website for

5    publishing the FSB's articles, through the mouthpiece of the

6    African People's Socialist Party.

7           So there are predicate acts that would have been

8    difficult to plead with specificity as overt acts.  The overt

9    acts in the indictment are designed to give the defense notice

10   of the case against them, the scope of the charges and the

11   allegations.

12          THE COURT:  So if I was acting at the direction of a

13   foreign agent knowingly, and the direction was to travel to

14   Memphis, that would be a violation of the statute, and I did

15   the travel?

16          MR. MARCET:  So, yes, Your Honor.

17          So we'll talk about in terms of whether it would meet

18   the letter of the law in the statute.  I think it would.

19          You're taking an action, you're acting as an agent,

20   you're acting under the direction and control of the foreign

21   government, you're not notifying the Attorney General.

22          Now, in that case, you may have -- particularly if

23   there was some First Amendment expressive interest, you may

24   have a problem under intermediate scrutiny, in terms of what

25   the government did, in terms of enforcing it, to restrict that

1    speech.

2             THE COURT:  Are you saying the Court should draw a

3    distinction, for example, on the four-city tour, that the very

4    fact they -- regardless of why they were making the tour, the

5    fact that they traveled is action that is prohibited under the

6    statute?

7             MR. MARCET:  Absolutely, Your Honor.  But I don't

8    think Your Honor needs to make that distinction, because I

9    think what Section 951 does, and other cases in the Supreme

10   Court has noted the distinction, it focuses on the direction

11   and control of the foreign government.  That's what triggers

12   it.  Whatever the action is, whether it's traveling, whether

13   it's speech, it falls within the scope of the statute.

14            Now -- and so, yes, you could say that traveling

15   would be one facet of the violation.  There will be evidence of

16   that at trial.  But I don't think that distinction is

17   constitutionally relevant in terms of -- I think the statute

18   can apply just to speech.  For example, publishing of newspaper

19   articles, and other, are forms of speech.  I mean, that can be

20   the action that satisfies it.  As long as it's at the direction

21   and control of the foreign principal.

22            So, Judge, I'd like to start by discussing what I

23   understand the defense to now be arguing, then talk about what

24   the indictment actually charges, lay out the appropriate legal

25   framework.  And then we can explain how that applies to the

1    indictment in this case.

2              So as I understand it, as clarified today, the

3    defendants are making two and a half or three arguments.  So

4    first argument is very clear, that the indictment targets them

5    for their political speech and, therefore, must be subjected to

6    some heightened scrutiny under which it fails.

7              Second, as clarified today, that the overt acts

8    alleged in the indictment would not satisfy the elements of act

9    under the statute.

10             And then third, to the extent it would, I understand

11   them to be saying that if it does reach their conduct of

12   speech, then it's unconstitutionally overbroad.  So none of

13   these arguments are meritorious.

14             So I think it's important to frame the indictment --

15   the charges in the indictment in the correct light, because

16   there seems to be a lot of confusion in terms of what are the

17   defendants actually charged with.

18             So what the indictment alleges is that for seven

19   years the defendants conspired to act and acted as undisclosed

20   agents of a hostile foreign intelligence service on United

21   States soil.  The common theme of the acts are not what the

22   defendants did, much less what they said, but the fact that

23   they acted.  All of the acts were at the direction and control

24   of a foreign government, and they were done without

25   notification to the Attorney General.  And they did all of this

1    knowing at the outset that, in their own words, they were being

2    used by the Russian government to, quote, utilize forces inside

3    of the U.S. to sow division inside the U.S.

4             So how did they do this?  Well, the indictment

5    discusses a wide array of means in which this statute was

6    violated.  So first, they traveled to Russia to discuss future

7    cooperation with an FSB representative.  And at their request,

8    to meet with an official representative of the Russian

9    government.

10            They communicated about the FSB's plan to use them,

11   to use their group, to engage the U.S. and EU in serious

12   struggle and to sow division inside the U.S.  That's their own

13   explanation of the purpose of their actions at the direction

14   and control of a foreign government.

15            They participated in the FSB plan regarding funding

16   and consulting the campaign for elected office, as alleged in

17   the manner and means, and again in the overt acts.

18            They published articles written by Ionov, an FSB

19   representative.  And they also wrote and published their own

20   articles, but the only articles that the indictment is

21   concerned with is the one they wrote and published at the

22   direction of the Russian government.  And we'll talk about it,

23   that's a distinction from the evidence that was presented in

24   *Dumeisi*.

25            They invited Ionov, as a representative of the

Russian government, to speak to the American people.  They made

public statements in support of Russian interest at the

direction of Ionov.  They permitted the FSB representative,

Ionov, to exercise direction and control over and provide

financial support, consulting, and instruction over political

campaigns in the U.S.  They agreed to participate in a plan to

affect public perception concerning Russian detainees.

They requested and received financial support, as

well as promotion of Russian state-sponsored media.  And they

provided detailed information regarding their activities for

reports to higher levels of FSB, including about plans, in

their words, as written down by Aleksandr Ionov to carry out

the more effective campaigns during municipal elections, close

quote, and quote, to lay the groundwork for a new electoral

base, close quote.  Those were their reports to Ionov that was

reported up the chain of command up to Russian intelligence.

And that was all done for seven years, concealing the Russian

government's involvement.

So that's what the indictment is concerned with, is

that these defendants for seven years acted at the direction of

a hostile foreign intelligence service without notification to

the Attorney General --

THE COURT:  And explain to me how those reports were

done.

MR. MARCET:  The reports?

1          THE COURT:  Yeah.

2          MR. MARCET:  They would have phone calls, or

3    sometimes they would send written documents to Ionov, or

4    pictures, and he would then compile them in reports.

5          He would then -- they were considered very sensitive

6    by the FSB, so -- and again, this is going beyond what was in

7    the indictment, but this is going to be evidence at trial.  But

8    they were either hand-delivered or they were transmitted

9    through other encrypted applications that we don't have the

10   results of.

11         So, for example, how we know that -- again, not in

12   the indictment, but just for Your Honor's understanding -- is

13   on some occasions, Ionov would accidentally send over

14   WhatsApp -- which we have because it was stored in his

15   iCloud -- he would accidentally send a report, a pop-up of

16   WhatsApp, and the pop-up was lambasted, and say, that's super

17   sensitive, send over telegram, don't send that here.

18         We have all of them because he backed them up to his

19   iCloud, but when they transmitted it, it was either

20   hand-carried or more secure encrypted communications.

21         THE COURT:  All right.

22         MR. MARCET:  So the legal standard -- or the legal

23   framework here either can come from *Texas v. Johnson* concerning

24   generally applicable statutes that incidentally regulate speech

25   or expressive conduct, or it can come from the time, place, and

 1    manner restrictions.

 2            I think Section 951 shares some characteristics of

 3    each and shares some distinctions from each, but I think either

 4    way, the statute's content neutral.  And at the bottom, the

 5    question boiled down to, is there substantial government

 6    interest in enforcing the statute in this case.  That's

 7    unrelated to the suppression of free expression.

 8            And both the Supreme Court and the Eleventh Circuit

 9    have said, whether this is an applied challenge to a time,

10    place, and manner restriction or to a statute regulating

11    expressive conduct, the analysis is largely the same.

12            THE COURT:  How do you reconcile *Dumeisi* then?

13            MR. MARCET:  Which case?

14            THE COURT:  *Dumeisi*.

15            MR. MARCET:  In terms of the discussion you were

16    having about the --

17            THE COURT:  Yes.  The guidance by the court makes it

18    very clear by the instruction given, there's a concern about

19    the infringement of the First Amendment.

20            MR. MARCET:  Yes, two points.

21            So first, the district -- that was the district

22    court's instruction, that's the not the Seventh Circuit pattern

23    instruction.  That was an instruction that the district court

24    gave and that the Seventh Circuit said, well, whatever the

25    correct instruction is, this protected his First Amendment

1    rights.   But as Your Honor pointed out, in the next sentence

2    they say his instruction, that publishing articles can't

3    violate the statute, is misleading because it --

4            THE COURT:   Well, the Seventh Circuit didn't say

5    that.   The district court said that and gave the instruction.

6    The Seventh Circuit never commented on that one way or the

7    other.

8            MR. MARCET:   I thought we agreed that it was

9    misleading as to the laws.

10           THE COURT:   Well, the court refuses the instruction

11   and said given the following, and then it reads the instruction

12   given.

13           It says, it is not a violation of 951 to publish a

14   news article.   The court refuses the instruction and said,

15   given the following, and then it goes on to *Dumeisi*'s argument.

16           The only thing the Seventh Circuit says is what I had

17   acknowledged to Mr. Goodman, which reads, given that an element

18   of 951 is acting subject to the direction or control of foreign

19   government official -- and there was evidence that Justin

20   Dumeisi published articles at the behest of the IIS -- we find

21   this publication relevant and agree with the district court

22   that *Dumeisi*'s proposed instruction would have been misleading

23   as to the law.

24           So that's to your point, but in what context?

25           MR. MARCET:   Yes.   So, Judge, that's -- I think there

1  are two things going on in *Dumeisi*.

2          Like I say, I think what the Seventh Circuit is

3  saying is, the instruction that publishing articles can't

4  violate a statute is misleading as to the law, because, yes,

5  standing alone, publishing articles can't violate the statute.

6  If done at the direction and control of a foreign government,

7  it can.

8          And how do we know that's the Seventh Circuit's view?

9  Because in the very -- when they discussed the sufficiency of

10  the evidence, that's one of the main things they point to is

11  showing he was -- there was sufficient evidence to convict him

12  that he published articles at the direction and control.

13          The other thing going on in --

14          THE COURT:  I'll ask you the question I've been

15  asking then.

16          Yes, at the direction or control, but does the

17  motive, the reason for publishing the articles, does that

18  matter?

19          MR. MARCET:  Judge, I think --

20          THE COURT:  Because in that case it was to identify

21  dissidence.

22          MR. MARCET:  I think yes in two ways.

23          One, yes, under the Texas statute the reason -- air

24  quote matters -- that the reason has to be that it's done at

25  the direction and control.

1              In the second, when we get into our First Amendment

2    analysis, you may have cases where there is such an innocuous

3    purpose behind the entire 951 agency relationship, and there's

4    a restriction on publishing articles, where you may have a

5    First Amendment balancing problem.  Okay.  Well, Government,

6    these are totally innocuous articles, there's no evidence of a

7    nefarious purpose.

8              Do you have a substantial national security interest

9    in enforcing the statute in this particular case, given that it

10   restricts speech?

11             So there could be -- the nefarious intent --

12             THE COURT:  I'll frame my question much better.

13             So I'll ask, do you -- in this case, do you have a

14   substantial interest?

15             MR. MARCET:  Yes, Your Honor.  May I please finish

16   addressing *Dumeisi*, and then we'll get to that, because there's

17   a second point I want to make on *Dumeisi*, because I think we'll

18   probably -- we will probably be with Judge Jung and revisit

19   this before trial and we get to the jury instructions.

20             What was going on with *Dumeisi* was that the

21   Government was actually offering 404(b) evidence of speeches

22   and other things that were done, not at the direction and

23   control of Iraqi intelligence, but that were being offered to

24   explain why does Dumeisi, a Palestinian, work for Iraqi

25   intelligence.  So there was stuff that was just purely offered

1    to show his views.  So the instruction in that case was plainly

2    proper.

3           We're not intending to talk about the defendants'

4    views outside the scope of what they published at the direction

5    and control of Russian intelligence.  So this case is

6    different, in terms of whether that instruction will be

7    appropriate, but the reference to speeches in that instruction

8    is specifically for reference of 404(b) evidence that the

9    government introduced.  And we can file, if it becomes

10    important, those filings for Your Honor and the defense to

11    review.

12           THE COURT:  You're arguing it's irrelevant whether

13    it's the defendants' views or not.

14           MR. MARCET:  A hundred percent, yeah.  It's

15    absolutely irrelevant.

16           Whether they're publishing things consistent with

17    their views or antithetical to their views, or I think a lot of

18    times in this case, things that aren't necessarily antithetical

19    to their views, or there's some evidence of that at trial, but

20    things that weren't anything of interest to them, but that were

21    of interest to the FSB, so they just regurgitated what they

22    were told in these articles.

23           These were not things that they were historically

24    interested in.  The Russian Olympic team, for example, there's

25    articles about other not -- other topics that I would submit

1  are not in any way in line with their views, not necessarily

2  opposed to their views, but just things that were of interest

3  to the FSB and not to them.

4          But the alignment or interest or the antagonism of

5  interest I think is irrelevant, if it's done at the direction

6  and control.  That's not to say we could introduce other things

7  they published that were pro-Russian or anti-Ukrainian, that

8  had nothing to do with this agency relationship in the evidence

9  of the crime, but if it's done in the scope of the agency

10  relationship, at the direction and control of the FSB, our view

11  is that violates the statute, and that furthers the national

12  security interest.

13          So speaking of the substantial national security

14  interest.  Just talking about 951 in general, the Eleventh

15  Circuit has said, quote, the government has an interest in

16  knowing the identity of those acting on behalf of a foreign

17  government within the United States, whether that action is

18  legal or not, that's *Durand*.

19          The Fourth Circuit characterized that as a strong

20  interest in *Rafiekian*.  We'll talk about *Rafiekian* in a moment.

21  Almost identical to this case, in terms of the actions that

22  were being engaged in.

23          The recent history of -- again not in the indictment.

24  And we're in a difficult situation here, because we're

25  typically not pled to -- we're not required to plead all the

1    government interests justifying the prosecution in the

2    indictment.  We're required to plead the elements.

3         But as the indictment discusses in several

4    paragraphs, there is a historical effort of the particular

5    intelligence services involved in this case, Russian

6    intelligence, in using these sort of influence operations to

7    target U.S. democracy, to target U.S. politics, to target

8    western alliances, and that's what this case is about.

9         This case falls into the historical national security

10   threat posed by Russian active measures, and that's exactly

11   what this case is.  And as defendants' own words in this case

12   show, they knew they were part of an active measures operation

13   designed to sow discord, to sow mistrust, to publish whatever

14   the Russian government directed them to publish in furtherance

15   of the Russian government's names, and that's why there's a

16   substantial national security interest.  And that national

17   security interest is unrelated to the content of what they were

18   publishing.

19        How do we know that?  Well, first of all, the

20   indictment -- the posts in the indictment are not on any

21   coherent topic.  It's not like the indictment only talks about

22   anti-Ukraine posts, or only talks about reparations.  The

23   indictment talks about the stuff that the Russian government

24   was interested in using as part of this active measures

25   campaign, whether that's accusing the United States of

1   genocide, whether that's promoting the Russian invasion of

2   Ukraine.

3           The content isn't what matters, it's the fact that it

4   is part of this undisclosed secret maligned influence

5   operation.  And that's what justifies a national security

6   interest here.

7           And there's recent history showing how important that

8   is.  I mean, everybody knows, it's been widely reported,

9   there's a public indictment against the U.S. Internet Research

10  Agency for attacking the U.S. elections.  And how did they do

11  it?  How did the Russians attack the U.S. elections?  Not by

12  promoting any particular viewpoint, they did it by promoting

13  all viewpoints on all sides and trying to cause division.

14          So these operations are not about the content of the

15  speech.  They're about creating division, sowing discord,

16  because that is the Russian government's aims.

17          So I want to talk about the other Section 951

18  decisions that we've cited.  And I think that there's some

19  misunderstanding about what they actually involve.

20          So *Rafiekian* -- all the goal in *Rafiekian* was, was to

21  promote positive views of the investment climate in Turkey,

22  publish op-eds, and to make a documentary disparaging a Turkish

23  dissident, in the hopes that it would affect U.S. government

24  action.

25          But I don't think the defendants are arguing, I

1    certainly wouldn't, that those actions, but for the involvement

2    of a foreign power directing them, those would all be protected

3    by the First Amendment.  You can publish op-eds on any topic

4    you want, make documentaries.  It's the fact, again, that that

5    speech, those actions were being taken at the direction and

6    control of a foreign government.

7            *Alshawhe*, which has the language the defendants like

8    about Section 951 regulating action and not conduct, the goals

9    in that case were identical to this case, influence public

10   opinion and foreign policy positions of a political candidate,

11   help a foreign government promote its foreign policy positions,

12   and advocate for certain political appointees.

13           Judge, those are all poor First Amendment protected

14   rights, if you're not acting in the direction and control of a

15   foreign government, in which case the government is entitled to

16   put a reasonable restriction that there needs to be notice

17   prior to doing it.

18           *Dumeisi*, as we've already discussed, involved

19   providing information for reporting direct intelligence; we

20   have that here.  It involved publishing articles for Iraqi

21   embassy; we have that here.  It involved telephone conferences

22   with the Iraqi embassy to receive instructions.

23           THE COURT:  I want you to go back to the very first

24   one.

25           How do we have that here?

1          MR. MARCET:  Providing information?

2          THE COURT:  Yes.

3          MR. MARCET:  That's one of the manner and means

4  alleged in the indictment.  That is -- that's Overt Act 62,

5  that's the manner and means, G.  It's Overt Acts 24 and 25, 40

6  to 41, and 60 to 65.

7          So Overt Acts -- so the Overt Acts 60 to 65 are the

8  reports that Ionov was writing in court saying, you know, I

9  talked to Penny Hess, I talked to Omali Yeshitela, here's what

10  they told me, and those were those super secret reports that

11  were going up the chain of Russian intelligence.

12          THE COURT:  But what's that information that's being

13  reported?

14          MR. MARCET:  Information about their activities,

15  about their plans for future elections, about what's going on

16  with their campaigns, about protests that they're planning to

17  conduct, about money that they need from Ionov to carry out

18  protests.  Just the general communications updating Ionov on

19  the actions they're taking for a conspiracy.

20          THE COURT:  And how is that similar to *Dumeisi*?

21  *Dumeisi* was reporting different matters.

22          MR. MARCET:  Well, it's -- the whole point of *Dumeisi*

23  is that he was gathering information, which he's entitled to do

24  as a journalist, and was passing it to -- I mean, I don't think

25  there's any allegation in *Dumeisi* that there's any unlawful

1    gathering of intelligence that he was engaged in.  He's passing

2    along things he knows for reporting to a foreign hostile

3    intelligence service.

4              THE COURT:  It was the government's theory, at least

5    as articulated in that opinion, that *Dumeisi* was publishing

6    those articles to identify opposition members.

7              MR. MARCET:  Correct.  Yes.

8              THE COURT:  And so what's being done here then?

9              MR. MARCET:  They're publishing articles at the

10   direction and control of the Russian government to serve the

11   Russian government's purposes, which we assess to be a malign

12   influence operation.

13             And we assess that, not based on the content of the

14   articles, but based on the defendant's own words, as well as,

15   you know, the comments of Popov, for example, the FSB handler,

16   talking causing turmoil about --

17             THE COURT:  Sorry to keep interrupting.

18             That's what I want to be clear about.  The whole

19   theory of the government is it's an undisclosed secret maligned

20   interest to create division and sow discord?

21             MR. MARCET:  That's the purpose of the conspiracy,

22   yes.

23             THE COURT:  All right.

24             MR. MARCET:  And so on to the *Maria Butina* case,

25   which you see mentioned in the indictment.  Maria Butina had

1    associations with Alexander Yanov, and they communicated with

2    her about the handler.  That case is 18 criminal 00218 of the

3    District of Columbia.

4            The overt acts in that case were attending political

5    meetings and trying to promote pro-Russian views.  Again,

6    things that typically would be protected by the First Amendment

7    but cannot be done without notice to the Attorney General if

8    being done at the direction and control of a foreign power.

9            And one other point, Judge.  All of the acts -- you

10   know, the defendants try to distinguish certain First Amendment

11   protected activities, like lobbying, which we see in some of

12   these cases, from what they were doing, publishing speeches,

13   and that are sort of thing.  All of this conduct is separately

14   illegal, whether what the defendants were doing, promoting

15   Russian propaganda at the direction of the Russian government,

16   or lobbying, or trying to influence global campaigns at the

17   direction of a foreign government.  It's all separately illegal

18   anyway.  It's all in the same category of political activities

19   under the Foreign Agent Registration Act.

20           So these are all First Amendment activities that the

21   government has identified -- or that fall into the same

22   category, but if being done at the direction and control of a

23   foreign power, they raise these national security concerns.

24           And so bottom line, this is not at all an unusual

25   application of Section 951.  Section 951, perhaps not

1   exclusively, but often involves otherwise lawful conduct that

2   is being done at the direction and control of the foreign

3   government.   It also involves First Amendment-related

4   activities and it imposes a minimal case --

5             THE COURT:  Can you give me an example of the first

6   argument, as far as lawful conduct?

7             MR. MARCET:  All the cases I just told you, as well

8   as the United States --

9             THE COURT:  Beyond speech.

10            MR. MARCET:  Lawful conduct beyond speech, like being

11   applied to --

12            THE COURT:  Yes.  Yes.

13            MR. MARCET:  So *United States v. Duran*, the Eleventh

14   Circuit specifically says they distinguish between lawful

15   conduct -- and this gets to what Your Honor is talking about,

16   lawful conduct and innocent conduct.

17            So what they say is, everything Duran did, it was

18   unseemly, it was lawful, but it certainly wasn't innocent

19   because they're trying to get someone to make a false

20   statement.  So I think that goes to what Your Honor's been

21   saying about the purpose of the conduct.

22            And so *Duran* -- I believe it was some sort of bribery

23   and extortion scheme, but the Eleventh Circuit said it may be

24   lawful under the U.S. law, but it's not innocent.

25            I also wanted to talk about the nature of the

restriction here.  I think it's particularly relevant if you look at the time, place, and manner restriction.  I think it's also relevant under strict scrutiny though.

So this is -- we keep -- I do it as much as anyone, we keep calling it a registration requirement.  It's not even a registration requirement.  It's a notification requirement.  There's no approval process and it's a very light requirement.

The requirement's found in 28 Code of Federal Regulations 73.3, and it lays out all that you need to do to comply with the statute.  So all it requires is a letter, a telex, or a fax, providing the name of the agent making the telecommunication, the firm name and business address, the identity of the foreign government or official, and a brief description of the activities to be conducted in their duration.  That's all this requires to comply.

So what's important about that is, when you look at what's the national security interest?  Unmasking hostile foreign intelligence actors on U.S. soil.  What's the remedy?  Minimal notification.  It's the least restrictive means of achieving that end.  It's just requiring a minimal notification which serves the national security interest that these intelligence services cannot be operating, whether it's extortion or bribery schemes or propaganda schemes on U.S. soil without notification.

And the Communist party of the United States shows

1   the Supreme Court upholding a far more burdensome content-

2   specific registration requirement observing that it is the

3   highest duty of Congress to prevent incursion by unidentified

4   agents of a foreign power.

5        And the defense is right that that case did involve

6   Congressional findings, but the registration requirement in

7   that case did not even require action.  It just required

8   existence of the status of the organization.

9        Now, what's interesting, as it applied to Section 951

10  and the indictment in this case, is that the Supreme Court

11  distinguished between what triggered application of the

12  statute.  They said it wasn't speech, but it was the foreign

13  domination and control of the organization.  And so that's the

14  same thing here.

15       What's triggering this notification requirement isn't

16  that the defendants can speak on whatever they want.  If it's

17  true that they were making posts on similar topics in 2014,

18  they were well within their rights to do that.  It's the doing

19  those posts at the direction and control of a foreign

20  government.  It's that direction and control, that foreign

21  domination and control that triggers Section 951's application.

22       I want to touch on some of the cases that you

23  discussed with the defendants.  *Cohen v. California* is not a

24  content-neutral case.  *Cohen v. California* is a generally

25  applicable statute.  It applies to both speech and to -- it

applies to both speech and through nonspeech conduct, but it is not a content-neutral case because it only prohibits disturbing the peace by, quote, offensive conduct.

So as applied to speech, it's necessarily a content-specific statute, because it applies to the speech based on its offensive content. So as the Supreme Court in that case framed the issue, it was can -- essentially, can California ban the F-word, and all other obscenities to follow, and the ruling was no, that's content. People are entitled to choose the content of their speech.

And the only thing that justified applying the statute to *Cohen* was his use of a particular word, the content of his speech that rendered it offensive. And so that's not only a content-specific statute, it's a content-specific prosecution.

*De Jonge*, again, that statute is far afield from Section 951. It was an entire ban on an entire category of speech in association. No speech or no association for the purposes of discussing, peacefully, criminal cynicalism (sic). Section 951 does not target speech, nor does it target the content of speech. And again, it doesn't ban anything, it just requires notification.

*NAACP v. Button*, similarly, directly targeted and removed an entire category of speech from society. *Thomas v. Collins*, similarly, a statute in a court order that prohibited

1  speech on a specific topic.

2          *Meyer v. Grant* -- so *Meyer v. Grant*, not content

3  specific, but it does target speech.  That statute prevented

4  people from paying to help get ballot initiatives onto the

5  ballot to help collect the signatures.

6          Well, here Section 951 does not target speech.

7  Section 951 does not ban any sort of speech or any sort of

8  agency relationship.  You're free to hire.  Section 951 just

9  requires notice.  And interestingly, the Supreme Court in *Meyer*

10  was concerned with the right of the principals, the right of

11  the people who wanted to influence political change to engage

12  in commercial transactions to hire people and amplify their

13  voice.

14          Here the principals are the Russian FSB.  So to apply

15  *Meyer v. Grant* to this case, you'd have to change the holding

16  to read as follows, quote, the FSB seeks by petition to achieve

17  political change in Colorado, their right to freely engage, in

18  discussions concerning their need for that change is guarded by

19  the First Amendment.

20          The FSB, operating covertly in Russia, does not have

21  a First Amendment right to engage in speech in the United

22  States.  So *Meyer v. Grant* is distinguishable for several

23  reasons.

24          And finally, Judge, in terms of the scrutiny

25  analysis.  As I see it, even if strict scrutiny applies, the

1    indictment survives.  The interests in this case are very

2    substantial.  Here we have -- on the one hand, we talked about

3    what's the burden on speech.  Well, the burden on speech is

4    just a notification.  On the other hand -- and there's no

5    prohibition.  They could have engaged in everything they did

6    with notification.

7            On the other hand, we have a seven-year conspiracy

8    involving the first or the second most hostile intelligence

9    service in the world to the United States' interest, who in

10   recent years has ramped up their efforts to do these sorts of

11   active defender campaigns, carrying out numerous actions over

12   the course of the years, these defendants, over seven years,

13   targeting elections, targeting Democratic processes.

14           And in addition, to the extent Your Honor believes

15   strict scrutiny is appropriate, we're at the motion to dismiss

16   stage.  I think drawing all inferences in favor of the

17   indictment, we do survive strict scrutiny, and I think that

18   should be an issue to be decided by the judge at trial, in

19   terms of whether the evidence at trial, which is going to be

20   much more than was pled in the indictment, meets the compelling

21   interest required by strict scrutiny.

22           So I've addressed why I think the statute in the

23   application of the indictment survives --

24           THE COURT:  Let me ask a question about that last

25   point.

1        MR. MARCET:  Yes, sir.

2        THE COURT:  Why?  What else?  Are you suggesting

3   there are other evidence that is not in the indictment that

4   would be relevant to that inquiry for strict scrutiny analysis?

5        MR. MARCET:  Yes.  Right.  So the strict scrutiny

6   analysis, in terms of the national security interest in

7   enforcing the statute to the FSB's use of these individuals,

8   asked whether there's a compelling government interest in doing

9   so.

10       Compelling government interest, if the Court is going

11  to apply that standard at trial, I think it's going to broaden

12  the scope of what's relevant at trial.  If we're required to

13  prove compelling evidence of national security interest at

14  trial, I think a whole host of actions by Russian

15  intelligence -- part of this conspiracy, as well as outside of

16  this conspiracy, are relevant to that determination as to

17  whether disrupting a -- this particular Russia hostile active

18  measure, in the realm of everything the Russian intelligence

19  services are doing to undermine our democracy, undermine our

20  alliances, I think that will broaden the scope of what's

21  relevant.

22       So, yes, I think -- if we are going to be held to

23  strict scrutiny, I think we're going to have to litigate that

24  issue in terms of what's relevant, but I think it will broaden

25  what we can introduce.

1       So lastly, the overbreadth argument.  Like I said, I

2   think Section 951 applies to this, whether it's actions or

3   whether it's speech.  It's acting at the direction or control

4   of the Russian government.  So I don't think there's any way to

5   construe Section 951 not to encompass the defendants'

6   arguments, and there's no overbreadth with that instruction.

7       As the Supreme Court's observed, rarely, if ever,

8   will an overbreadth challenge succeed against the law or

9   regulation that is not specifically addressed to speech or to

10  conduct necessarily associated with speech, such as picketing

11  or demonstrating.  That's *Virginia v. Hicks*.

12      So again, the plain language of Section 951

13  encompasses defendants' actions, and it is not specifically

14  addressed to speech.  So it falls into that category of

15  statutes that will rarely, if ever, pose overbreadth problems.

16      In addition, as other courts to consider these

17  overbreadth challenges have observed, the elements of the

18  statute provide protection of the constitutional rights, as

19  *Dumeisi* observed.  It only applies to actions taken as an agent

20  of a foreign government.  A term that's well defined and easily

21  understood, as every court has held.  And it only requires

22  minimal notice, there's no prohibition.

23      So given these protections, there is no reason to

24  think the substantial number of real world cases in which First

25  Amendment rights are being infringed.

1　　　　And the defendants' overbreadth cases are similarly

2　distinguishable.  *Thornhill v. State of Alabama*, that was a

3　picketing statute, so again, directly targeted expression.  And

4　as the Supreme Court observed, it had the practical effect of

5　criminalizing every practicable method whereby the facts of the

6　labor dispute may be publicized in the vicinity of the place of

7　business of the employer.

8　　　　Again, Section 951 does not impose a ban on anything,

9　and there is no targeting the speech based on this content.

10　　　　And *Dombrowski v. Pfister*, that too was a

11　content-based statute requiring registration of groups

12　advocating a particular idealogy with subversion.

13　　　　The court had already invalidated similar statutes,

14　as they violated due processes, that's actually what the

15　holding rested on, that they said they remanded it for a

16　potential narrowing interpretation, not for overbreadth in the

17　true sense, but to see if there could be a construction of the

18　statute that would address the vagueness concerns.

19　　　　Here, "agent" is a readily understood term, clearly

20　defined in the statute, so there's no vagueness concern.  So

21　Section 951 is properly construed because the defendants'

22　conduct is not overbroad.

23　　　　And I'm open to any other questions, Judge.  But we

24　request that you issue a report recommendation recommending

25　denial of the defendants' motions.

 1            THE COURT:  Thank you.

 2            Mr. Goodman, any response?

 3            MR. GOODMAN:  Yes, Your Honor.

 4            I want to address a few comments that I heard from

 5  Mr. Marcet, and also answer any questions that this Court might

 6  have.

 7            THE COURT:  Well, I do have a couple questions, so

 8  why don't we start with that.

 9            MR. GOODMAN:  Sure.

10            THE COURT:  The first argument about doesn't matter

11  if it's benign conduct or not, if it's the record that --

12  excuse me -- if it's at a foreign haven's direction, it's in

13  violation of the statute, what is your position there?

14            MR. GOODMAN:  Well, the conduct that I've heard

15  Mr. Marcet talking about, traveling between four cities to

16  give -- to give speeches, that's protected speech.

17            The -- you know, *NAACP v. Button* was a case where the

18  defendants were doing -- NAACP was doing litigation in order to

19  advance political causes.  Speech, the Supreme Court has made

20  clear that the political speech is not just the actual

21  speaking.  In *Meyer*, it was traveling to bus stations and

22  collecting signatures from paid agents was political speech,

23  political activity.

24            So I didn't hear Mr. Marcet say anything that was an

25  action, such as in all of the other --

1        THE COURT:  So if I accept the allegations as true,

2   which is the government's theory being that it's a maligned

3   interest to sow discord, based on your argument, then the

4   statute cannot prohibit that.

5        MR. GOODMAN:  Cannot -- the First Amendment cannot

6   prohibit --

7        THE COURT:  And under the facts of this case, it

8   cannot be prohibited just to have speech to sow discord at the

9   direction of a foreign government, is that your position?

10        MR. GOODMAN:  I guess I don't really understand this

11   argument.

12        First of all, Your Honor, there -- so are we talking

13   about the motive of -- so basically, a Russian national, who

14   the government alleges is connected to the Kremlin,

15   contributed -- over six or seven years, contributed 7,000 in

16   funding to this organization.  Most of it was for this

17   four-city tour.

18        There was a relationship between them, so there was

19   phone calls and emails saying, hey, would you publish this

20   article.  And if the APSP said yes, we'll publish that, it

21   aligns with our interests, but sometimes they said no, we're

22   not going to do what you're asking because it doesn't align

23   with our interest.

24        THE COURT:  Sometimes they said no, and then there

25   was a disagreement, and then they published it?

1        MR. GOODMAN:  Well, there was one that we cite in the

2   motion, there's a -- this is a discussion where Ionov asked

3   them to unite with a separatist group out of California.  And

4   the African People's Socialist Party said, no, we are not

5   continuing this meeting unless you exclude them from a meeting.

6   This is a group that doesn't align with our interest and we'll

7   not work with them, so I'm not sure exactly what you're saying.

8        THE COURT:  So Overt Act Number 37, Ionov directed

9   Hess to draft a petition on genocide of African people in the

10  U.S.  When Hess suggested Ionov should promote and publish the

11  petition himself, Ionov reiterated his directive to publish the

12  petition because, Ionov, we're, quote, not exactly black to

13  demand operations for themselves.  Ionov continued to send

14  money to APSP and pressure Hess to publish the opinion, which

15  it openly did.

16        MR. GOODMAN:  Well, again, we're sort of conflating a

17  couple things, because the African People Socialist Party

18  has -- has raised the issue before the United Nations of

19  genocide, and reparations, and compensation for African people

20  long before there was any connection with Ionov.

21        THE COURT:  But the government just argued, we don't

22  need to conflate it, it doesn't matter.  In other words, the

23  content of the speech is completely irrelevant.

24        As I appreciated their argument at times, operatives

25  such as this will provide speech for opposing views just to

1  create the discord.  And so the government's theory is that

2  there was an agreement, a knowing agreement, to issue content,

3  or publish content, or publish speech at the direction of a

4  foreign agent for the purpose of discord.

5          And my question, come back again to you, is in the

6  context of this case, are you saying that that is not

7  prohibited by the statute?

8          MR. GOODMAN:  I don't think it is, but I don't think

9  the indictment actually says that, Your Honor.

10          The indictment doesn't say that there was an

11  agreement of the -- the agreement is very vague in the

12  indictment.  It says that there was some bilateral cooperation

13  agreement and there was some sort of alliance between this

14  Russian national and the African People Socialist Party.

15          I don't think there's any allegation that there's a

16  direct agreement that they would sow discord in the United

17  States.  And I think the government is being a little bit

18  misleading with this Court.

19          So, for example, the government is talking about

20  encrypted messages between Ionov and some person in the FSB.

21  This has nothing --

22          THE COURT:  I'm not going to consider that --

23          MR. GOODMAN:  So I guess the point is, if the African

24  People's Socialist Party believes in reparations in doing a

25  four-city tour, and has done this -- in fact, the chairman

1   published a book in 1982 called Reparations Now.  This is an

2   issue that they've championed this issue for years.  They've

3   championed this issue for 40 years, and now Russia is

4   interested in the issue too.

5           Now, what is Russia -- Russia is willing to support

6   and pay some of the costs, because doing a four-city tour

7   incurs a lot of expenses.  They brought in witnesses.  They set

8   up tents.  They had to provide food for people to present their

9   information, so this was expensive.  Russia is willing to

10  support the tour.

11          What is Russia's motive for doing it?  Is it the same

12  as the African People's Socialist Party?  Maybe not, but that

13  to me is irrelevant.  It's clear that the African People's

14  Socialist Party is promoting issues that -- and the government

15  doesn't dispute this.  We say, well, we're not saying that any

16  of the issues that they've promoted were not aligned with their

17  idealogy; they were.  Even the issues with the Ukraine war and

18  the criticism of the African People's Socialist Party about the

19  war in Ukraine, these are all positions that are well formed.

20          And I ask the Court to look at the 2014 Burning Spear

21  article, which I cite in the motion to dismiss.  But this

22  directly refutes the argument that they're somehow speaking for

23  Russia.  In 2014, more than a year before the African People's

24  Socialist Party chairman made his trip to Moscow --

25          THE COURT:  I'm going to interrupt you there.

 1              That's a purely factual dispute.  And that argument

 2   as to who they were speaking for, why should I consider that

 3   now?

 4              MR. GOODMAN:  I understand, but you're talking about

 5   motives.  You're talking about whether motives matter and --

 6              THE COURT:  As I see how motive matters and what it

 7   goes to is the governmental interest.

 8              MR. GOODMAN:  Well, so I guess the question is, they

 9   believe in reparations.  They're doing a tour.  Russia is

10   willing to support that tour, but maybe Russia's motive is

11   something else.  Maybe they like this issue for some other

12   reason.

13              THE COURT:  But then how do you overcome Overt Act

14   18, which makes clear there's at least knowledge upon the

15   defendants as to those motives?

16              MR. GOODMAN:  That there was some discussion -- that

17   overt act is a little bit confusing to me.

18              It's talking about a discussion, saying that we

19   understand that maybe Russia's motives are different than our

20   motives.

21              I don't know.  I -- I mean, I'm having trouble

22   understanding why the defendants can't take support from a

23   foreign actor.  They're allowed to take support.  They're a

24   not-for-profit.  They're allowed to take support from a foreign

25   actor for their issues.

1          Now, if the foreign actor has a different agenda,

2     does that mean -- but they're speaking toward advances, their

3     core idealogy and core issues that they've been fighting for 40

4     years.

5          THE COURT:  I don't know that I necessarily disagree

6     with you, and I think that's a valid argument.  But that's not

7     one I need to decide on the motion to dismiss yet.  That would

8     be -- if I accept the government's position, as outlined in the

9     indictment, the remainder of that is just factual arguments.

10         MR. GOODMAN:  Your Honor, I think what you're saying

11    is that because the government is concerned that Russia has a

12    different interest, that, therefore, you should restrict the

13    defendant's First Amendment rights to make speeches because

14    they have some relationship.

15         I mean, that's what the *De Jonge* court said.  Yes,

16    the Communist party might have different views, if the idealogy

17    does not coincide with the United States government.  But

18    they're allowed to have a peaceful, lawful discussion of those

19    views.  And the government can't -- cannot shut them down

20    because -- or put them in jail just because they have a

21    relationship with Communists, so...

22         THE COURT:  No disagreement there.  But isn't there a

23    significant factual -- significance of it's what is being done,

24    speech being done or published at the direction of the foreign

25    agent?  Nothing prohibits any of the individuals from any

1  speech that they wanted to give in any relation to any

2  identified speech in this case.  But the significant part is at

3  the direction of the foreign agent, added with their theory as

4  to the purpose of that.

5          MR. GOODMAN:  Russia's purpose or the defendants'

6  purpose?

7          THE COURT:  Russia's purpose.

8          If they know the purpose, that's one of their

9  theories, is there was an agreement to accomplish that purpose,

10  whether that's factually correct or not or something to be

11  proved to a jury, but that certainly seems to be what the

12  government's theory is.

13          MR. GOODMAN:  So -- but again, Your Honor, if the

14  defendants' purpose is this is an important issue for us, as

15  the African People's Socialist Party, and we're getting some

16  trivial amounts of support from a Russian national, and they

17  may have some alternative purpose, therefore, we can't -- we

18  can no longer -- we can no longer champion this issue that's a

19  core issue for our group?  That's what I'm having trouble with,

20  Your Honor.

21          You know, the defendants are not party to these

22  encrypted conversations between Ionov and some FSB agent.

23  They're not party to those.  And there's no encrypted

24  conversations between the defendants and Ionov.  This was an

25  out-in-the-open relationship.

1          Yeah, they didn't register because there was no

2    requirement that they knew of that they were supposed to

3    register.  They had a relationship, and they have relationships

4    with foreign governments all over the world.

5          I mean, as I talk about in the motion to dismiss, the

6    chairman travels and speaks and aligns with the government of

7    Spain, and African governments, and Ireland.  They align with

8    certain issues and they get support from these governments on

9    certain issues.

10          Now, do they have to question, now what is your

11    reason?  Do you have a different motive for supporting this

12    issue that's important to us?  I don't think that the First

13    Amendment requires that, Your Honor.  And I think the -- and

14    again, we're saying -- you know, I heard Mr. Marcet say, well,

15    they're making statements that are in support of Russian

16    interests, but they were making these same statements in 2014

17    before they had any relationship with Russia, so this is their

18    political opinion.

19          Now you may disagree with it.  You may disagree with

20    what they're feeling about NATO expansion, and all the articles

21    that they wrote about the coup in Ukraine in 2014 and the

22    United States' responsibility and the United States'

23    provocation of this conflict.  You may disagree with that, I

24    may disagree with that, but they have a right to their

25    political opinion.  And they've had this political view.  We

1    can't ignore that.  These are published articles.  They held

2    this political view long before they traveled to Russia.

3            So to say that this is -- they're speaking in support

4    of Russian interest.  I mean, even the Olympics, they've long

5    spoken about Russian national pride and -- I mean, yeah, this

6    might not be a core issue for them, but it was certainly in

7    alignment with their idealogy that Russia should be allowed to

8    compete in the Olympic games.  And I don't see how this is any

9    national security compelling interest that the government

10   should stop an article being published to support Russia's

11   desire to compete in the games.  I mean, Americans are allowed

12   to have views that align with Russia on certain issues.  The

13   First Amendment is very clear on that.

14           I think the other thing that I heard Mr. Marcet say

15   is that the national security interest has nothing to do with

16   the content of the speech.  So it's just merely their

17   relationship with a Russian and the fact that a Russian likes

18   what they're saying, or is somehow supporting it in trivial

19   ways.  That just can't be the law, Your Honor.  I don't think

20   we can allow that, that this is a compelling interest.  This is

21   a compelling interest such as having a Congressional finding

22   that your activities are furthering terrorism.  I mean, to

23   say --

24           THE COURT:  Let me ask you this question.

25           If the government limited the evidence, that is, the

content of any of the speech be limited and not published to a

jury, but rather simply the evidence be presented at the

direction the defendants did a four-city tour and gave a

speech, or at the direction, the defendants published an

article; content not admitted.  What would your position be?

MR. GOODMAN:  But then there's no case.  There's no

crime.  Because what is the crime?  You know, in --

THE COURT:  The crime is acting at the direction of a

foreign agent to perform those acts, whether -- and that was my

question to you.  The government's position is that it can be a

benign conduct, but it's the matter that triggers the violation

of the statute is acting knowingly at the direction of a

foreign agent.

MR. GOODMAN:  As long as those actions are not

political speech.

Again, the example that was given, I think in the

*Rafiekian* case, I believe, as well, is it a violation of 951 if

I buy plane tickets for a Russian official to come to the

United States, or if we get them hotel rooms when they -- are

we acting as their agent if we're getting hotel rooms, is that

a violation of 951?  I don't know the answer to that, maybe it

is.  This case is different because it's all speech.  It is all

speech.  It's not actions.  And there's no allegation that they

did any action --

Now, the *Rafiekian* case, now Mr. Marcet says, no, it

 1   was op-eds, and this and that.  It was lobbying.  It was

 2   basically a legal lobby.  They basically were under contract

 3   with the Turkish government to convince -- and these were high

 4   officials, this was Michael Flynn and his partner, to basically

 5   lobby the U.S. government to extradite this preacher, who was

 6   living in Pennsylvania, who Erdogan believed had attempted a

 7   coup.  We want him brought back to Turkey.

 8          So they had an action item.  That's what they were

 9   doing.  So it's a little bit different than what these guys --

10   these guys are making political speeches in alignment with

11   their idealogy.  I think to suggest that this case has nothing

12   to do with the content of their speech is just -- it's asking

13   the Court to really put its head in the sand because, you know,

14   as I point out in the motion to dismiss, there's think tanks in

15   Washington, D.C. that take -- Brookings Institute takes

16   $3 million from United Arab Emirates to publish op-eds to

17   promote the policy priorities of the UAB, and the government

18   doesn't seem to have a problem with that.

19          And I would suggest, because those op-eds are not

20   critical, they're not directly critical of the United States

21   government policies, so I don't think we can ignore the fact

22   that the government is prosecuting prominent critics of its

23   foreign policy.  A thorn in the government's side.  And not

24   only the African People Socialist Party, they have their own

25   newspaper so they can speak directly to their supporters, and

1  to ignore that that has something to do with why the government

2  is targeting people.

3        Again, I can't get into the government's head and

4  talk to their motive, but I think when you look at some of the

5  think tanks the government doesn't seem to have a problem with,

6  you kind of have to understand that this is a content of their

7  speech that the government doesn't like.

8        And again, you might not agree with it, I might not

9  agree with it, but it's their political speech, they have the

10  right to do it.  And the Supreme Court has spoken for 80, 90

11  years and has made it very clear that you cannot infringe on

12  somebody's right to give political speeches, travel to give a

13  political speech, to publish articles in their own newspaper.

14  You can't infringe on that without a compelling interest, and

15  the government has not even come close to showing any

16  compelling interest.

17        This indictment needs to be dismissed, Your Honor.

18  And you know, as the Court said in *Dombrowski*, you know,

19  allowing this case to go to trial has -- a case that directly

20  targets political speech and dissent -- which is what this is

21  about, it's about people that are disagreeing with their own

22  government and want things to be better in this country and are

23  major critics of the United States.  Allowing this case to go

24  to trial, even if the defendants are acquitted and the

25  government is unable to show that they're agents, it still has

1    a very dangerous effect on free speech.

2           This is what the *Dombrowski* court says -- the Supreme

3    Court said in 1965, because of the sensitive nature of

4    constitutionally protected expression -- this was about

5    overbroad regulations, which is a little bit different than

6    this case -- although subject to overbroad regulation and risk

7    prosecution to test their rights for free expression of

8    transcendent value to all society and not merely to those

9    exercising their rights might be the loser.

10          So again, Your Honor, that's -- the Supreme Court is

11   saying, you know, even allowing an indictment like this to go

12   forward, even if these defendants -- my client is in her

13   mid-70s, the chairman is in his early 80s -- even if they're

14   acquitted, to put them through a trial, not only is it not fair

15   to them, but it is dangerous for society and for free speech

16   because it's basically saying, yes, the government can do this.

17   It can put people on trial for political speech that the

18   government doesn't like.

19          I forgot to mention just one other thing, and that is

20   on this content neutral, where I heard Mr. Marcet sort of

21   disputing and saying, well, these cases are different.  I

22   wanted to cite this language from *Reed v. Arizona*.  This is a

23   case that the government cites in its memo.

24          And again, this is a -- this is like a time, place,

25   and manner case, but the court says that our precedence have

1    also recognized a separate and additional category of laws,

2    that those facially content-neutral will be considered content-

3    based regulations of speech.  Laws that cannot be justified

4    without a reference to the content of the regulated speech or

5    that we're adopted by the government because of disagreement

6    with the message the speech conveys.  And that's from *Reed v.*

7    *Arizona.*

8           So it is well established that you can't take a

9    content-neutral law and use it to target speech and then say,

10   oh, this is just incidental because the law itself is content

11   neutral, just pretend that this case is like a time, place, and

12   manner restriction.

13          THE COURT:  Doesn't that raise my prior question

14   about, could the trial just simply go forward by removing the

15   content of the speech?

16          MR. GOODMAN:  But then I don't understand what the

17   crime is, Your Honor.  Because I think Mr. Marcet has admitted

18   that it's the speeches that are apparently the crime.  So what

19   is the crime?

20          This is an indictment that targets speech.  It

21   doesn't target any actions.  They weren't trying to --

22          THE COURT:  Is it a crime of giving the speech at the

23   direction of a foreign agent or is it a crime of giving the

24   content of the speech at the direction of a foreign agent?  And

25   as I understood Mr. Marcet's argument, it's completely

1    irrelevant as to what the content is.

2         MR. GOODMAN:  Okay.  So, again, giving a speech at

3    the direction of a foreign agent -- I mean, I don't think we

4    can ignore the fact that the African People's Socialist Party

5    has been around since the '70s, and they're an activist group,

6    and that's what they do, they give speeches.  So now even if

7    the government can prove because all of a sudden because the

8    chairman took a trip to Moscow, that they're now agents of

9    Russia and giving speeches that are consistent with their

10   idealogy, but now they're giving those speeches for Russia.

11        I think it really is hard to even make that argument.

12   But if the government could prove that, that they were giving

13   speeches, I still -- it's still speech making.  You have to

14   look at the content of the speech, that's what the Court said

15   in *De Jonge*.  It's about the content of the speech.

16        If the speech crosses boundaries, then the government

17   can restrict it, but if you're giving a speech that Russia

18   likes or that Russia wants or that Russia is asking you to

19   give, if it's a political speech, you're allowed to do it.

20        Thank you.

21        THE COURT:  Thank you.

22        Mr. Akbar, anything?

23        MR. AKBAR:  I do have a brief response, Your Honor.

24        But Mr. Taylor wanted to go to the restroom.  I just

25   wanted to make sure that was okay.

 1            THE COURT:  Why don't we take a break.

 2            MR. HERNANDEZ:  Is it possible to be excused?

 3            THE COURT:  Yes, Mr. Hernandez, you may be excused.

 4            You don't want to make any further argument?

 5            MR. HERNANDEZ:  I waive my appearance for the rest of

 6   the record.

 7       (Recess 11:43 a.m. to 11:55 a.m.)

 8            THE COURT:  Mr. Akbar, are you ready?

 9            MR. AKBAR:  Yes, sir, Your Honor.

10            THE COURT:  All right.  You may proceed.

11            MR. AKBAR:  Your Honor, I don't intend on belaboring

12   the point, I know we've been in here for a while already.

13            I guess I wanted to address one of the questions that

14   the Court had for Mr. Goodman about a point the Government

15   made, and specifically, it was explaining that publishing an

16   article is an action punishable under 951, as long as it is in

17   the direction and control of foreign agents.  And the Court

18   asks do we agree with that, and we do not agree with that.

19            And again, because if that action of speech, we

20   believe that it is protected.  And also, policy wise, it's a

21   slippery slope that that can take place from the government's

22   position.  When 951 was created by Congress, the world was a

23   lot bigger, of course.  Well, now the world is a lot smaller.

24            What I mean by that is, we have social media, we have

25   ways that people like Ionov can contact people just by sending

1   a message or direct message on social media.  So if the

2   government's position is true, then Ionov can message me,

3   direct message me, and say, hey, I have connections, not I'm a

4   foreign agent, just that I know people in the -- in FSB.  Do

5   you mind reposting this post for me?  And I say, yes, I will

6   repost that post for you, and now I'm under indictment by the

7   U.S. government.

8          I don't think that's what 951 was intended to do.

9   And I think -- and I also believe that that's why speech is

10  protected, in order for us to voice opinions, voice positions,

11  even if it's in opposition to the U.S. government, even if it's

12  in opposition to what others think, it's still protected

13  speech.  So there needs to be an overt act more than just that

14  protected speech.

15         So I don't want us -- the point of that is, taking

16  the government's position, it puts us in a slippery slope, and

17  simple acts, such as reposting something on Twitter, or

18  Facebook, or anywhere else will fall under 951.

19         THE COURT:  Thank you.

20         Ms. Griffin.

21         MS. GRIFFIN:  I don't have anything to add,

22  Your Honor.

23         Thank you.

24         THE COURT:  First of all, I want to sincerely give

25  the highest compliments to each of you, particularly

 1  Mr. Goodman with the first motion.  It's well thought, well

 2  drafted, and highlights a very important significant issue, as

 3  you've made clear in your arguments.

 4          And I also compliment the government on its position

 5  in trying to identify the issues.  So I want that to be clear,

 6  that is of great value to the Court to have the quality of

 7  lawyering that has been efforted in this matter to help me

 8  understand the issues at stake, which are very significant.

 9          The protection of free speech is at the core of our

10  constitutional rights, and so I'm looking at that and the

11  government's interests.  That is what is at issue in this case.

12          I intend to effort, as diligently as possible, to

13  view the matter more and get out a report and recommendation to

14  Judge Jung, and I will take it under advisement until then.

15          I'm not going to rely upon -- Mr. Goodman, you had

16  asked me if I wanted you to look and brief as to the *Stromberg*

17  case.  I'm not going to rely upon that in my decision.  It was

18  just a case of interest to me.  I think given the date of the

19  case and some recent opinions since that case, it's not of

20  significance, but nonetheless one that is of interest.

21          Thank you all for your time.  We'll be adjourned.

22      (Hearing adjourned at 12:00 p.m.)

23

24

25

1                        <u>REPORTER'S CERTIFICATE</u>

2            I, SUSIE K. CAYLER, a Registered Professional

3    Reporter, certify that the foregoing transcript is a true and

4    correct record of the proceedings given at the time and place

5    hereinbefore mentioned; that the proceedings were reported by

6    me in machine shorthand and thereafter reduced to typewriting

7    using computer-assisted transcription; that after being reduced

8    to typewriting, a certified copy of the transcript will be

9    filed electronically with the Court.

10           I further certify that I am not attorney for, nor

11   employed by, nor related to any of the parties or attorneys to

12   this action, nor financially interested in this action.

13           IN WITNESS WHEREOF, I have set my hand at Tampa,

14   Florida, this 10th day of October, 2023.

15

16                               <u>/s/ *Susie K. Cayler*</u>

17                               Susie K. Cayler, RPR
                                 Federal Official Court Reporter
18

19

20

21

22

23

24

25