UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No.  8:22-cr-259-WFJ-AEP

OMALI YESHITELA
a/k/a "Joseph Waller,"
PENNY JOANNE HESS,
JESSE NEVEL,
a/k/a "Jesse Nevelsky," and
AUGUSTUS C. ROMAIN, JR.,
a/k/a "Gazi Kodzo"
_____/

## REPORT AND RECOMMENDATION

Before this Court is Defendant Penny Hess's Motion to Dismiss Superseding Indictment (Doc. 107). Defendants Omali Yeshitela, Jesse Nevel, and Augustus C. Romain have adopted the instant Motion (Docs. 114, 123, 127, 136). By the Motion, Defendants argue the Superseding Indictment should be dismissed on First Amendment Free Speech grounds because the Superseding Indictment directly targets political speech and 18 U.S.C. § 951 is unconstitutional as applied. The United States contends that Section 951 targets Defendants' conduct rather than speech and is constitutional as applied under an intermediate scrutiny standard. On September 28, 2023, this Court held a hearing on the matter. Based upon the parties' briefs and the overall record, the undersigned finds that Defendants' arguments must fail at this time, and therefore, recommends that Defendants' Motion be denied.

I.      **Factual Background Procedural History**

On April 13, 2023, Yeshitela, Hess, Nevel, and Romain (Defendants) were charged by Superseding Indictment with conspiring to act as agents of the Russian government without notification to the Attorney General, in violation of 18 U.S.C. §§ 371 and 951 (Doc. 12). Defendants Yeshitela, Hess, and Nevel were further charged with a substantive violation of Section 951 (Doc. 12, at 35). These charges arise out of Defendants' alleged affiliation with the African People's Socialist Party (APSP) (Doc. 12).

The Superseding Indictment (Doc. 12) alleges that Yeshitela is the founder and chairman of the APSP, Hess is a leader of a component of the party, and Nevel is a member of the party (Doc. 12, at 5–6). According to the Superseding Indictment, the APSP was a political group based in St. Petersburg, Florida, that promoted its views using multiple media outlets, including websites it operated, social media, and a radio station (Doc. 12, at 5). The Defendants assert that the APSP supports the rights of African people throughout the world to be free from colonialism (Doc. 107, at 1). They state that the party also advocates for "free speech and political association, a guarantee of the right to work for the betterment and emancipation of black people without fear of political imprisonment and the loss of life, limb, and livelihood" (Doc. 107, at 2). The Defendants further contend that the APSP publishes its own newspaper, *The Burning Spear*, where it shares information and opinions on many of the issues the party has championed over time (Doc. 107, at 2). According to the Defendants, these issues largely include demand for reparations for "the centuries of

genocide, oppression, and enslavement" and opposition to "U.S. and Western European political, economic, and military interference in the affairs of Africa and African people throughout the world" (Doc. 107, at 2). The Defendants contend that as part of the APSP's advocacy, the chairman and other party members regularly travel to participate in conferences in foreign countries, including Nicaragua, Northern Ireland, South Africa, Spain, England, France, Germany, Belgium, Sweden, and Jamaica (Doc. 107, 3–4). Relevant to the instant Motion, Yeshitela traveled to Moscow twice in 2015 to attend conferences arranged by Aleksandr Viktorovich Ionov and his group, the Anti-Globalization Movement of Russia (AGMR), which trips were detailed in *The Burning Spear* (Doc. 107, at 4).

The Superseding Indictment specifically alleges that Defendants conspired with Ionov, Yegor Sergeyevich Popov, and Aleksey Borisovich Sukhodolov, and others, to act as agents of the Russian Government without notification to the Attorney General (Doc. 12, at 9). Ionov was the founder and president of the AGMR and worked on behalf of several Russian Federal Security Service (FSB) officers, including Popov and Sukhodlov (Doc. 12, at 4–5). The Superseding Indictment contains allegations describing the relationship between Ionov and Defendants through the APSP in several ways: (1) Ionov communicated with FSB officers, developing and executing a plan to recruit, fund, and direct U.S. political groups, like the APSP; (2) Ionov sent articles containing Russian propaganda to Defendants working on behalf of the APSP with instructions to publish them; (3) Ionov and AGMR provided financial support and instructions to the APSP to promote Russian Federation interests (Doc. 12, at 10–

3

11). Significantly, the Superseding Indictment alleges that Defendants were aware of Ionov's ties to Russian politics as demonstrated by Nevel's email to Yeshitela, Hess, and other APSP members stating that AGMR is an "instrument of Russian government" (Doc. 12, at 17).

The Overt Acts (OA) alleged in the Superseding Indictment assert the following actions Defendants took in furtherance of the conspiracy. In July 2015, Ionov directed Hess to draft a "petition on Genocide of African people in U.S." (Doc. 12, OA ¶ 5). Hess in turn drafted the petition and posted it on a petition website and "the site of the White House" (Doc. 12, OA ¶ 12). Ionov donated $500.00 to the APSP shortly after the petition was posted (Doc. 12, OA ¶ 11). In January 2016, Hess requested that AGMR provide approximately $12,000 in funding for a "four-city tour" (Doc. 12, OA ¶ 19). Additionally in this letter, Hess thanked Ionov for his "leadership in envisioning such actions" (Doc. 12, OA ¶ 19). Ionov requested that the APSP draft a detailed report describing the four-city tour, and Hess subsequently drafted a summary of Yeshitela's remarks on the tour (Doc. 12, OA ¶¶ 22–23). During this exchange, Ionov again sent money to the APSP in the amount of $3,476.20 (OA ¶ 24). In July 2016, Ionov requested that the APSP publish an article in support of the Russian Olympic team (Doc. 12, OA ¶ 27). Hess and Yeshitela drafted the article, and Hess published it on behalf of the APSP (Doc. 12, OA ¶¶ 28–30).

It is alleged that throughout 2020 and 2021, Defendants provided information about their activities in the United States, specifically public demonstrations and protests, to Ionov (Doc. 12, OA ¶¶ 60–62). Ionov continued to financial support the

APSP during these demonstrations by contributing $1,200 to Yeshitela for a protest in Washington, D.C. (Doc. 12, OA ¶ 62). When Russian President Vladimir Putin announced that Russia had invaded Ukraine, Ionov emailed Nevel, who later forwarded to Yeshitela and Hess, outlining the Russian government's message regarding the invasion (Doc. 12, OA ¶ 66). In response, the APSP hosted several virtual conferences expressing solidarity with the Russian government (Doc. 12, OA ¶¶ 68–71). On or about March 13, 2022, the APSP allowed Ionov to speak at one of these video conferences to explain the Russian invasion of Ukraine (Doc. 12, OA ¶ 70). In sum, the Overt Acts allege that Defendants' acts of publishing, traveling, drafting reports, and hosting virtual conferences all at the alleged direction of a foreign agent in violation of 18 U.S.C. §§ 371 and 951 (Doc. 12).

## II.    Legal Standard

Pursuant to Federal Rule of Criminal Procedure 7(c)(1), "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment is sufficient if it includes "all elements of the offense and briefly describe[s] the facts of the commission of offense." *United States v. deVegter*, 198 F.3d 1324, 1330 (11th Cir. 1999).

A motion to dismiss an indictment may only be decided prior to trial if the court can rule on the motion "without a trial on the merits." Fed. R. Crim. P. 12(b)(1). This requirement is met only if a "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the [motion]." *United States v. Covington*, 395 U.S. 57, 60 (1969). In analyzing a motion to dismiss, the

court is limited to the allegations in the indictment and must read those allegations in the light most favorable to the government. *See United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987). Under Federal Rule of Criminal Procedure 12(b), an indictment may be dismissed where there is an infirmity of law in the prosecution; however, a court may not dismiss an indictment on a determination of facts that should have been developed at trial. *United States v. Korn*, 557 F.2d 1089, 1090–91 (5th Cir. 1977);[1] *see United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1082 (5th Cir. 1987) (on a motion to dismiss the indictment the district court must not pierce the pleadings or make a premature resolution of the merits of the allegations).

## III.   Discussion

Defendants in the instant Motion primarily argue that Section 951 is unconstitutional as applied because prosecuting Defendants under this statute would improperly infringe on their First Amendment free speech protections. Defendants contend that only their free speech is at issue, and there is no evidence of action or conduct on their part that would bring this prosecution under the authority of Section 951. The Government counters that Defendants' speeches, conferences, publications, and travel were all done under the direction or control of Ionov, a foreign agent, and constitute conduct or action under the meaning of Section 951. The Government argues that prosecution under Section 951 is constitutional as applied because

---

[1] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

Defendants' conduct surpassed merely speech in this context. This undersigned agrees that Defendants' newspaper publications and attendance at conferences surpass merely speech when done at the direction or control of a foreign government, and thus, this prosecution falls under the purview of Section 951. Further, Section 951 is not unconstitutional as applied under an intermediate scrutiny standard. Accordingly, it is recommended that Defendants' Motion be denied.

## A.     The Overt Acts in the Superseding Indictment describe the Defendants' conduct, not merely speech

Defendants first argue that this case is purely about speech, and because Section 951 explicitly criminalizes only action, the statute cannot apply here to Defendants free exercise of speech (Doc. 107, at 8–11). The issue raised by Defendants' argument is whether the Superseding Indictment alleges any instances of action or conduct on behalf of the Defendants that would bring this prosecution under the authority of Section 951.

Section 951 makes it a crime for an individual other than an officially recognized diplomatic or consular officer to "act[] in the United States as an agent of a foreign government without prior notification to the Attorney General." 18 U.S.C. § 951(a). The statute defines an "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d). The relationship between the foreign government and its agent "does not need to mirror an employee's control over the workings of an employee; a lesser degree of 'direction' is sufficient." *United States v.*

*Rafiekian*, 991 F.3d 529, 541 (4th Cir. 2021). Section 951 "is a general intent crime, and knowledge of the notification requirement need not be proven by the Government." *United States v. Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010). The Seventh Circuit has held that a conviction under Section 951 requires only "for the jury to conclude that [the defendant] took acts of some kind on behalf of [foreign government] without first registering as a foreign agent." *United States v. Sami Koshaba Latchin*, 554 F.3d 709, 715 (7th Cir. 2009).

Notably, Section 951 applies "whether the action is legal or not." *United States v. Duran*, 596 F.3d 1283, 1295 (11th Cir. 2010) ("The broad sweep of § 951 creates a plethora of possibilities under which those engaged in purportedly legal conduct on behalf of a foreign government could be convicted if an agent of a foreign government fails to notify the Attorney General."). Particularly, the statute "covers any and all affirmative conduct taken on behalf of a foreign government, and is not limited to espionage or subversive activities." *Duran*, 596 F.3d at 1295–96.[2]

Defendants argue that the "Overt Acts charged in the indictment all relate to speech," to wit: "political speech and peaceable assembly" (Doc. 107, at 10). Therefore, Defendants contend that prosecution under Section 951 is improper without evidence of conduct or actions to satisfy the statute. However, the Supreme Court has recognized that "words can in some circumstances violate laws directed not

---

[2] The Defendants highlight that "the APSP defendants are not charged with helping Russia achieve any particular action item in the United States, such as gaining extradition of a wanted dissident, freeing a prisoner, or obtaining relief from sanctions. Nor are they charged with espionage or fraud." (Doc. 107, at 9).

at speech but against conduct." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) (stating that a "particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech"). Further, the Supreme Court stated that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006).

As it relates here, Defendants' speech alone is not necessarily "acts" within the gambit of Section 951, but when done at the alleged direction of a foreign government, such speech does rise to the level of "acts" within the meaning of Section 951. The Seventh Circuit in *United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005), is supportive of this interpretation. In *Dumeisi*, the defendant was charged under Section 951 with conspiring to act as an agent of the Iraqi government without notification to the Attorney General for, among other things, "publishing certain news articles that would enable him to identify opposition members" at the direction of the Iraqi government. *Id.* at 570–71, 579. At trial, the defendant requested that the district court instruct the jury that "[i]t is not a violation of 18 U.S.C. § 951(a) to publish a news article." *Id.* at 579. The district court rejected that instruction, instead allowing the jury to consider the speech and newspaper articles "only insofar as they may pertain to issues of motive and intent." *Id.* Dumeisi appealed to the Seventh Circuit, arguing that the district court's refusal to give his requested instruction created the "very real probability that

the jury's verdict rested on the sole basis that Dumeisi printed articles in his newspaper." *Id.*

The Seventh Circuit rejected Dumeisi's First Amendment challenge, holding that his requested instruction that publishing articles cannot violate Section 951 was "misleading as to the law" because "an element of § 951 is acting 'subject to the direction or control of a foreign government or official,' 18 U.S.C. § 951(d), and there was evidence suggesting that Dumeisi published certain articles at the behest of the [Iraqi government]." *Id.* The Seventh Circuit affirmed that the district court's instruction made clear that "Dumeisi should not, and legally could not, be convicted simply for publishing unpopular or even despicable opinions." *Id.* Taken as a whole, the Seventh Circuit determined that because the defendant's articles were published at the direction or control of a foreign government, they are relevant to establish the action element required under Section 951.

Defendants instead contend the Seventh Circuit held that "'publishing articles at the direction of Iraqi intelligence' was protected by the First Amendment" (Doc. 131, at 7). This is a misstatement of the law in *Dumeisi*. The Seventh Circuit detailed that while the views and opinions contained the in the newspaper articles in isolation may be protected by the First Amendment, the act of publishing articles at the behest of a foreign government is relevant to the prosecution under Section 951 given that an element is acting "subject to the direction or control of a foreign government or official." *United States v. Dumeisi*, 424 F.3d 566, 579 (7th Cir. 2005); 18 U.S.C. § 951(d). Thus, it is proper for Defendants here, as in *Dumeisi*, that the prosecutorial scope of

Section 951 is not "simply [] publishing unpopular or even despicable opinions," but that such articles were published under the direction or control of the Russian government thereby constituting "acts" under the statute. *Dumesisi*, 424 F.3d at 579. To demonstrate, Defendants argue that the published opinions of Professors Jeffrey Sachs and John Mearsheimer, detailing nearly identical views, are not being questioned as to their free speech protection (Doc. 107, at 20). In that, Defendants seem to suggest that the Professors' opinions are equal to the action alleged against Defendants here and would also fall under the prosecutorial scope as the Government has defined. What Defendants overlook is that the Professors' opinions are not alleged to have been published at the direction of a foreign government. Defendants' articles, on the other hand, are alleged to have been published at the direction of a foreign government, the principal fact that moves the needle into the authority of Section 951. This crucial difference undermines Defendants' analogy. Thus, the Defendants' argument that the Superseding Indictment solely targets speech is misguided.

Further, a review of the alleged Overt Acts in the Superseding Indictment demonstrates that the Defendants actions and conduct surpass merely speech within the meaning of Section 951. The Superseding Indictment alleges that Defendants recognized that the Russian government was "more than likely" using Ionov's organization to "utilize forces inside of the U.S. to s[o]w division inside the U.S." and acted "for the purpose of advancing the interests of the Russian Federation." (Doc. 12, OA ¶¶ 18, 26(d)). Specifically, the Overt Acts allege Defendants published newspaper articles, gave speeches, attended conferences, and engaged in other conduct at the

direction of Ionov's organization, which Defendants acknowledged was an "instrument of Russian government." (Doc. 12, OA ¶ 17). The Overt Acts allege that at Ionov's direction and through his monetary funding, Defendants published a petition alleging genocide against African peoples in the United States. (*See* Doc. 12, OA ¶¶5–14). It is also alleged that Defendants engaged in a four-city tour "envision[ed]" and funded by Ionov to promote the genocide petition. (*See* Doc. 12, OA ¶¶19–26). Ionov allegedly directed that a report be drafted detailing the four-city tour and Hess drafted a report entitled "Meeting to sum up the Encampment Tour," which summarized remarks made concerning the four-city tour (Doc. 12, OA ¶¶ 20–23). According to the allegations, the Defendants published an article in support of the Russian Olympic team at Ionov's direction. (*See* Doc. 12, OA ¶¶27–30).

Further, the Overt Acts allege that Defendants provided information about their activities in the United States to Ionov, specifically public demonstrations and protests. (Doc. 12, OA ¶¶ 60–62). In return, it is alleged that Ionov continued to provide monetary funding to Defendants. (Doc. 12, OA ¶ 62). The Overt Acts allege that when Russian President Vladimir Putin announced that Russia had invaded Ukraine, Ionov emailed Defendants, outlining the Russian government's message regarding the invasion. (Doc. 12, OA ¶ 66). As a result of this communication, the Overt Acts allege that the APSP hosted several virtual conferences expressing solidarity with the Russian government and allowed Ionov to speak at one of these video conferences to explain the Russian invasion of Ukraine. (Doc. 12, OA ¶¶ 66–71). Collectively, the Overt Acts alleged matters beyond pure speech, as they include the acts of publishing, traveling,

drafting reports, and hosting virtual conferences all at the alleged direction of a foreign agent. Thus, the Superseding Indictment alleges several instances of Defendants' actions that surpasses merely speech, and such acts are within the scope of Section 951.

Accordingly, Defendants' argument that the Superseding Indictment must be dismissed because the Section 951 charges are based solely upon speech is without merit. Although the Defendants have identified in the Superseding Indictment numerous allegations related to instances of political speech, such speech when done at the direction of a foreign agent is properly within the scope of acts under Section 951. Further, contrary to Defendants contentions, the Superseding Indictment alleges conduct beyond pure speech, which conduct if directed by a foreign agent is also properly within the authority of Section 951.

**B.     Section 951 is a content-neutral statute and survives intermediate scrutiny**

Defendants further argue that Section 951 is unconstitutional as applied because the Superseding Indictment directly targets Constitutionally protected political expression. Defendants continually urge that the Government is only prosecuting this matter due to the Defendants' relationship with Russia. Defendants have structured their Motion to reflect absolute First Amendment protection over their political speech unless it incited imminent lawless action or was obscene (Doc. 107, at 11–23). This argument seems to mischaracterize a component of First Amendment jurisprudence. To that end, all speech is not intrinsically covered by the First Amendment, *see Cohen*

*v. California*, 403 U.S. 15, 19 (1971), but yet any speech that is covered by the First Amendment does not enjoy absolute protection and is subject to some limitations consistent with the nature of the speech and the Government's interest in regulating it. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–67 (2015) (explaining that a government only has the power to restrict expression if the regulation may be justified based on the type of speech restraint and the government's interest in limiting it).

To illustrate, speech that is obscene or has a tendency to incite imminent lawless action falls outside of First Amendment protection altogether and may be completely prohibited. *Roth v. United States*, 354 U.S. 476 (1957) (on obscenity); *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) (on inciting imminent lawless action). On the other hand, speech that does fall within First Amendment protection may still be subject to some regulations. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291–92 (11th Cir. 2021) (detailing "expressive conduct" and "time, place, and manner" regulations). But these regulations must appropriately balance the nature of the protected speech and the strength of Government's interest in limiting it. *Id.* at 1291. This balance has evolved into varying degrees of scrutiny used to evaluate regulations on speech. *Id.* (intermediate scrutiny); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005) (strict scrutiny). A court begins its analysis of regulations limiting speech by categorizing the statute as content-neutral or content-specific. "Government regulation of speech is [content-specific] if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. In contrast, content-neutral laws are those that do not regulate

speech based on its content, but rather they may regulate "expressive conduct," meaning that they incidentally burden expression via conduct, or they may regulate the "time, place, and manner" of expression. *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1291–92. A content-neutral statute is subject to intermediate scrutiny while a content-specific statute is reviewed under strict scrutiny. *Reed*, 576 U.S. at 163; *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1291–92. Although Defendants in their Brief and Reply inconsistently state which standard of review is applicable here, this Court assumes Defendants argue that strict scrutiny is appropriate. *Compare* (Doc. 131, at 5) ("[W]hether or not Section 951 is 'narrowly tailored to serve compelling state interests' is immaterial."), *with* (Doc. 131, at 8) ("We do argue that this indictment must be dismissed because it targets protected speech without any compelling government interest.").

In plain terms, Section 951 simply requires that those who intend to act as agents of a foreign government first notify the Attorney General. 18 U.S.C. § 951(a). From the bare language of the statute, Section 951 only targets action or conduct. The statute does not mention speech at all, much less make note of any content. Rather, the focus of Section 951 is on the "defendant's action and conduct as an agent of a foreign government." *United States v. Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010). To the extent that Section 951 incidentally burdens speech, it is content-neutral because it "serves [a] purpose unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see United States v. Alshahhi*, No. 21-CR-371 (BMC), 2022 WL 2239624, at *6

(E.D.N.Y. June 22, 2022) (quoting *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150–51 (2017) ("Section 951 regulates conduct, that is, acting as a foreign agent. Therefore, its 'effect on speech would be only incidental to its primary effect on conduct.'")). For those reasons, Section 951 is a content-neutral statute.[3]

Defendants in their Briefs decline to firmly label Section 951 as either content-neutral or content-specific but instead argue that strict scrutiny is appropriate regardless of Section 951's categorization. On the one hand, Defendants emphasize the "government's mis-use of the statute" would cause this Court to employ a heightened scrutiny in its analysis. Defendants rely heavily on *DeJonge v. State of Oregon*, 299 U.S. 353 (1937), in arguing that Section 951 as applied is a content-specific statute, triggering the application of strict scrutiny. Specifically, Defendants contend that the government here is seeking to criminalize lawful political speech based on Defendants' relationship with Russia. The defendant in *DeJonge* was convicted of violating a criminal syndicalism statute. *DeJonge*, 299 U.S. at 356–57. The criminal syndicalism statute effectively criminalized speech based on its content by making it unlawful to assist in the conduct of a public meeting associated with the Communist Party. *Id.* at 362. The Supreme Court determined that the State was within its power to prohibit force and violence associated with political advocacy but a complete prohibition encompassing otherwise lawful association and expression of political thought was improper. *Id.* at 363. Defendants in the instant Motion equate the criminal

---

[3] The United States District Court for the Eastern District of New York also determined that Section 951 is content-neutral.

syndicalism statute in *DeJonge* with Section 951 in an attempt to label it as a content-specific statute. However, the statute in *DeJonge* explicitly prohibited assembly designed to foster political change, thus clearly targeting speech and its content. In contrast, Section 951 neither targets speech of any kind, nor does it prohibit any conduct or incidental speech. Therefore, *DeJonge* may be distinguished from the case at bar because there the Supreme Court tackled a content-specific statute whereas Defendants here are facing prosecution of a content-neutral statute.

Alternatively, Defendants argue that the improper use of a content-neutral statute may still be subject to strict scrutiny under the Supreme Court's decision in *Cohen v. California*, 403 U.S. 15, 16 (1971).[4] In *Cohen*, the defendant was convicted under a breach of the peace statute for wearing a jacket displaying an offensive word to protest the Vietnam War and the draft. *Id.* at 16. The California statute prohibited maliciously and willfully disturbing the peace or quiet of any neighborhood or person by person. *Id.* Although the breach of peace statute was facially content-neutral and solely directed at conduct, the Court recognized that "[t]he conviction quite clearly rest[ed] upon the asserted offensiveness of the words," and "not upon any separately identifiable conduct." *Id.* at 18. By targeting the content of Cohen's speech then, the statute as applied was reviewed under a strict scrutiny standard. Thus, the State was

---

[4] More recently, the Supreme Court has affirmed this concept in *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015). There, the Court stated that "[o]ur precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys."

required to show a "compelling reason" to prevent Cohen from delivering his message because the Court determined his conviction was directed at the content of Cohen's speech. *Id.* at 18–19.

Defendants' case again is distinguishable. Unlike *Cohen*, the prosecution against Defendants is based upon conduct rather than merely speech, as determined above in Part A. Defendants' speeches and publications alone are not necessarily "acts," but when done at the direction of a foreign government, such speeches and publications rise to the level of "acts" within the meaning of Section 951. *See United States v. Dumeisi*, 424 F.3d 566, 579 (7th Cir. 2005). Because the allegations in the Superseding Indictment do not "quite clearly rest upon the asserted offensiveness of the words," but rather detail "separately identifiable conduct," the reasoning in *Cohen* does not support Defendants' position. *Cohen*, 403 U.S. at 18.

Once more, as Defendants underscore that the Government is only prosecuting here because of their criticism on U.S. policy, they even speculate that this prosecution would not have been brought if Defendants were promoting Russian literature or cuisine (Doc. 131, at 3). But this extraneous comment—which more likely challenges prosecutorial discretion, an issue which this Court will not address—in fact touches the heart of Section 951: content is irrelevant. The content of the directed conduct or action is simply immaterial for the purposes of prosecution under Section 951. *See Duran*, 596 F.3d at 1295 n.8. The Eleventh Circuit affirmed this in *Duran* when noting that the district court properly excluded evidence regarding relations between the United States and the foreign government at issue because that information was

irrelevant and inapplicable to the elements of Section 951. *Id.* So if Defendants were to publish articles about Russian literature and cuisine at the direction or control of the Russian government, then such conduct would indeed fall within the prosecutorial scope of Section 951. Accordingly, Defendants' argument that Section 951 is content-specific because the indictment "attempts to criminalize speeches in which defendants criticize" U.S. policy is unwarranted.

A content-neutral statute is subject to review under intermediate scrutiny. *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1291. To survive intermediate scrutiny, the statute must be "narrowly drawn to further a substantial government interest" that is "unrelated to the suppression of free speech." *Id.* In other words, this Court must find that Section 951 "advances important government interests" and does not "burden substantially more speech than necessary to further those interests." *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). First, it is clear that Section 951 furthers substantial government interests that are unrelated to the suppression of free speech. The Eleventh Circuit in analyzing Section 951 has recognized that "the Government has an interest in knowing the identity of those acting on behalf of a foreign government within the United States." *Duran*, 596 F.3d at 1295; *see also Rafiekian*, 991 F.3d at 538 (recognizing that Section 951 serves the United States' "strong interest in identifying people acting at the behest of foreign governments within its borders").

Second, Section 951 is narrowly drawn because its notification requirement is "not substantially broader than necessary to achieve the government's interest." *Fort*

*Lauderdale Food Not Bombs*, 11 F.4th at 1295. Section 951 does "sweep[] broadly" to the extent that it includes "any and all affirmative conduct taken on behalf of a foreign government." *Duran*, 596 F.3d at 1295–96. Notably, however, Section 951 does not prohibit such conduct at the direction of a foreign government. The statute merely requires that, if an individual wishes to act on behalf of a foreign government within the United States, he or she must notify the Attorney General prior to undertaking the action. Likewise, any incidental burden on speech accompanying such conduct is similarly not prohibited. Section 951 is sufficiently narrowly drawn to survive intermediate scrutiny. *See also United States v. Alshahhi*, No. 21-CR-371 (BMC), 2022 WL 2239624, at *6 (E.D.N.Y. June 22, 2022) (finding that Section 951 "easily survives intermediate scrutiny).[5]

## IV.   Conclusion

Defendants assert that Section 951 is unconstitutional as applied because the Superseding Indictment directly targets political speech, and it should be dismissed on First Amendment Free Speech grounds. Moreover, Defendants continually stress that the United States is pursuing this prosecution purely because of Defendants'

---

[5] Even still, if this Court were to agree with Defendants that Section 951 is a content-specific statute as applied, it survives strict scrutiny as well. To satisfy the strict scrutiny standard, a statute must be "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992)). Again, the scope of Section 951 advances the Government's "interest in knowing the identity of those acting on behalf of a foreign government within the United States." *Duran*, 596 F.3d at 1295. Section 951 is narrowly tailored so that the only burden on it imposes is notification to the Attorney General. In fact, Section 951's notification requirement is so narrowly tailored that there is effectively no prohibition on conduct at all, and even less so on any speech that may be secondarily impacted.

relationship with the Russian government. The United States contends that Section 951 targets Defendants' conduct and actions, not speech, and is constitutional as applied under an intermediate scrutiny standard. This Court agrees that Defendants' conduct rather than mere speech is present within the meaning of Section 951 because the Overt Acts allege that the speeches, publications, traveling, and hosting virtual conferences were done at the direction of the Russian Government. Thus, prosecution under Section 951 is appropriate since conduct is at issue. Further, in analyzing Section 951, the undersigned is satisfied that intermediate scrutiny is proper because the statute is content-neutral and finds that Section 951 is not unconstitutional as applied to Defendants under the intermediate scrutiny standard.

Accordingly, it is **RECOMMENDED** that Defendants' Motion to Dismiss Superseding Indictment on Constitutional Free Speech Grounds (Doc. 107) be **DENIED**.

**IT IS SO REPORTED** at Tampa, Florida, this 26th day of January 2024.

ANTHONY E. PORCELLI
United States Magistrate Judge